## COMMONWEALTH *VS.* RICHARD C. BALDWIN.

Essex. September 8, 1997. - November 10, 1997.

Present: WILKINS, C.J., ABRAMS, LYNCH, FRIED, MARSHALL, & IRELAND, JJ.

*Constitutional Law,* Self-incrimination. *Practice, Criminal,* Psychiatric examination, Recording of proceedings, Assistance of counsel, Capital case. *Privileged Communication. Mental Impairment. Homicide.*

Discussion of a criminal defendant's constitutional privilege against self-incrimination as it is implicated by a court-ordered psychiatric examination of the defendant pursuant to Mass. R. Crim. P. 14 (b) (2) (B). [109-110]

This court declined to adopt a new rule that an examination of a defendant pursuant to Mass. R. Crim. P. 14 (b) (2) (B) by a psychiatrist retained by the Commonwealth must be videotaped in all circumstances; rather, it remains within the judge's discretion whether to require an electronic recording of a *Blaisdell* v. *Commonwealth,* 372 Mass. 753 (1977), interview or to permit counsel to be present at the interview. [110-112, 112-113]

At a murder trial, the judge erred in foreclosing defense counsel's inquiry of the Commonwealth's psychiatric expert on the issue of the expert's reluctance to have conducted the defendant's examination while being videotaped or being observed by defense counsel, as that bore on the expert's credibility, however, where there was no dispute as to what the defendant said to the expert, the judge's ruling was not reversible error, in light of counsel's vigorous cross-examination of that expert, together with the extensive rebuttal testimony of the defendant's experts. [113]

INDICTMENT found and returned in the Superior Court Department on July 14, 1993.

The case was tried before *John L. Murphy, Jr.,* J.

*Hugh W. Samson* for the defendant.

*S. Jane Haggerty,* Assistant District Attorney, for the Commonwealth.

MARSHALL, J. On April 4, 1994, a jury found the defendant, Richard C. Baldwin, guilty of murder in the first degree on theories of deliberate premeditation and extreme atrocity or cruelty.

Before trial, Baldwin notified the Commonwealth of his inten-

tion to assert a defense of "diminished capacity."[1] A judge in the Superior Court granted the Commonwealth's motion for a psychiatric examination of the defendant. He denied Baldwin's request to condition that examination on having the interview recorded or permitting Baldwin's defense counsel to be present during the interview. Baldwin's principal contention on appeal is that the judge's denial of that request violated his rights under the Fifth and Sixth Amendments to the United States Constitution and art. 12 of the Declaration of Rights of the Massachusetts Constitution. We conclude that the conviction should be affirmed, and that the defendant is not entitled to relief pursuant to G. L. c. 278, § 33E.

1. According to testimony at the trial, the victim was killed on November 18, 1992. That day, Baldwin spoke several times on the telephone with a friend, Skye Albert-Hall (Hall), and told Hall in their last conversation that he wanted to die because the victim, a mutual friend, did not want to resume a dating relationship with him. At approximately 4:30 P.M. that afternoon, Baldwin arrived at Hall's home in Groveland. At Baldwin's insistence, Hall went to the victim's house, a short distance away, and persuaded the victim to return to Hall's house with him.

Hall retired upstairs, while the victim and Baldwin talked downstairs. The victim went upstairs twice and the second time told Hall that Baldwin had said he was going to kill her. Baldwin followed the victim into Hall's room upstairs, carrying a metal baseball bat. As he approached the victim, Baldwin asked her several times if she was scared, and then swung the bat at her. She deflected the first blow, falling down. Hall attempted to grab the bat away from Baldwin, but Baldwin pushed him away. Baldwin then swung the bat twice more, hitting the victim in the head, causing fatal skull fractures. At the time of her death, the victim was fifteen years old and Baldwin was sixteen years old.

Following the fatal attack, Baldwin left Hall's house and later

---

[1]"[T]here is no 'diminished capacity' defense in this Commonwealth." *Commonwealth* v. *Parker*, 420 Mass. 242, 245 n.3 (1995). We do recognize evidence of a defendant's mental impairment as relevant to the question "whether the crime of murder was committed at all," *Commonwealth* v. *Grey*, 399 Mass. 469, 470 (1987), including the issues of intent and knowledge, *Commonwealth* v. *Sires*, 413 Mass. 292, 299 (1992), and whether a murder was committed with extreme atrocity or cruelty. *Commonwealth* v. *Gould*, 380 Mass. 672, 683-686 (1980).

appeared at the Pentucket Regional High School. He asked for an ambulance because he had swallowed "some pills" and had drunk "some wine." He admitted to the principal and a teacher that he had killed the victim. Baldwin was arrested, charged, and then transported to Hale Hospital in Haverhill. His diagnosis there was a life-threatening ingestion of alcohol, Xanax, and Ibuprofen. While he was hospitalized, he admitted killing the victim to a nurse. Police officers on guard in the hospital room overheard Baldwin speak of the killing to his mother and to his father.

2. Baldwin was charged in the juvenile session of the Haverhill District Court with being a delinquent child by reason of murder. A transfer hearing was held and on July 7, 1993, the judge in that court ordered the juvenile complaint dismissed and the defendant bound over to the Essex County grand jury. On July 14, 1993, an Essex County grand jury returned an indictment charging murder against Baldwin and thereafter he was arraigned in the Superior Court. On December 23, 1993, Baldwin filed a notice regarding "diminished capacity,"[2] pursuant to Mass. R. Crim. P. 14 (b) (2) (A), 378 Mass. 874 (1978), stating "his intent to rely on expert testimony in connection with issues of premeditation, specific intent and malice," and that each such witness would rely in part on statements made by Baldwin. The Commonwealth responded by filing a motion for a psychiatric examination of Baldwin, pursuant to Mass. R. Crim. P. 14 (b) (2) (B), 378 Mass. 824 (1979). The judge allowed the psychiatric examination over Baldwin's objection, and refused Baldwin's request to condition the examination on having the interview either recorded on audiotape or attended by Baldwin's counsel.

Baldwin then filed a petition for a protective order pursuant to G. L. c. 211, § 3, which was denied by a single justice of this court. A motion for reconsideration in the Superior Court of the refusal to place conditions on the psychiatric evaluation of Baldwin was also denied.

The evaluation of Baldwin took place on February 24, 1994. In an affidavit later filed in the Superior Court in connection with a motion to suppress the testimony of the Commonwealth's psychiatrist, Baldwin stated that he had answered the psychia-

___

[2]The notice was amended on March 23, 1994, to include proposed expert testimony that Baldwin, by reason of mental disease or defect, "lacked substantial capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law."

trist's questions in the belief that if he remained silent, he would not be allowed to present his defense at trial. The Superior Court judge declined to take any action on Baldwin's motion to suppress because, he said, his earlier order regarding the psychiatric examination "was the subject of a petition to and a ruling of the Supreme Judicial Court."

At trial, in pursuing his defense of mental incapacity, Baldwin called two expert witnesses. The first, a psychiatrist, testified that Baldwin came from a highly dysfunctional family, marked by alcohol abuse and by verbal and physical aggression between his estranged parents and later between him and his father. The expert diagnosed Baldwin as suffering from a major depression episode on the day of the killing. He stated his opinion that depression and repressed aggression prevented Baldwin from conforming his conduct to the requirements of the law and from rationally premeditating the killing, and a dissociate reaction prevented him from forming the requisite intent for murder. Baldwin's second expert witness, a clinical psychologist and consultant to the Department of Youth Services (department), testified that Baldwin suffered from a major depressive episode on the day of the killing, and concurred with the first expert in evaluating Baldwin's criminal responsibility and abilities to premeditate and form a specific intent to kill. In addition, the second expert testified that Baldwin was incapable of appreciating the wrongfulness of his conduct.

As a rebuttal witness, the Commonwealth called the forensic psychiatrist who had examined Baldwin. He testified that he found no signs of mental illness in Baldwin at the interview or in records relative to his behavior just after the crime, as reported by Baldwin, Hale Hospital, or the department. He concluded that Baldwin did not suffer a mental disease or defect such that he lacked substantial capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the law, nor from a psychological disorder that would have disrupted his ability deliberately to premeditate murder or that prevented him from forming a specific intent to kill.

Baldwin's attorney vigorously cross-examined the Commonwealth's expert on his opinion, in light of Baldwin's experts' contrary opinions, as to Baldwin's mental health. Defense counsel also attempted to show in cross-examination bias stemming from the expert's history of testifying often in favor of the prosecution and against criminal defendants on the issue of criminal responsibility. Defense counsel also reviewed

the notes taken by the psychiatrist from the interview with Baldwin, noted that the notes were sparse, and cross-examined the expert about those that implied interpretations inconsistent with the expert's conclusions as to Baldwin's mental conditions.

3. A court-ordered psychiatric examination of a criminal defendant implicates the defendant's constitutional right against compelled self-incrimination guaranteed by the Fifth Amendment and by art. 12. We have observed that full cooperation by a defendant with a psychiatrist, who is an agent of the prosecution, may result in confession of the acts charged, probative admissions, leads to the discovery of other inculpatory evidence, information with which to impeach a defendant, and evidence as to a defendant's mental capacity. *Blaisdell* v. *Commonwealth*, 372 Mass. 753, 760 (1977). Only a constitutionally adequate grant of immunity or a valid waiver of the privilege by the person who possesses it suffices to overcome invocation of the privilege in a court-ordered examination. *Id.* at 761.

Rule 14 provides for certain procedures to protect the privilege, while allowing the prosecution to conduct a psychiatric examination in advance of trial, in cases where, as here, the defendant has given notice that he may assert a lack of criminal responsibility because of mental disease or defect and that he will introduce expert testimony that relies on his statements. A report of the examination is sealed and submitted to the judge and may be released in three circumstances: (a) if the judge determines that it contains no privileged information, (b) on the defendant's motion that it be made available to the parties, or (c) if the defendant testifies on his own behalf or offers expert testimony based in whole or in part on his statements as to his mental condition at the time of, or as to his criminal responsibility for, the alleged crime. Mass. R. Crim. P. 14 (b) (2) (B) (iii).[3] These procedures are intended to guarantee that privileged

---

[3]The Commonwealth filed a motion on March 7, 1994, assented to by Baldwin, for production and disclosure, on their being filed with the court, of reports on Baldwin by the Commonwealth's expert, as well as those of two expert witnesses testifying for Baldwin. The report of the Commonwealth's expert was filed with the court on March 21, 1994, and was released to both parties at some time prior to the commencement of the trial on March 25, 1994. The Commonwealth did not seek to introduce opinion or evidence based on the court-ordered interview or the Commonwealth's experts' reports until after Baldwin's expert psychiatric witnesses testified to their opinions, based in part on Baldwin's statements, as to his lack of criminal responsibility.

information is safeguarded until such time as a defendant voluntarily waives his privilege. *Blaisdell, supra* at 764. A defendant who chooses to testify at trial or to proffer expert witness opinion based on his out-of-court statements as to his criminal responsibility waives his privilege and opens to the Commonwealth the opportunity to rebut such testimonial evidence. *Id.* at 766. *Commonwealth* v. *Harvey,* 397 Mass. 803, 808 (1986).

On appeal, Baldwin claims no violation of these rule 14 procedures. Nor does he claim that privileged information from the court-ordered psychiatric examination was used at trial in any way other than to rebut expert testimony, based on Baldwin's out-of-court statements, which denied his criminal responsibility. He claims only that he should be entitled to condition his cooperation with a court-ordered examination (and subsequent waiver of his privilege at trial) on either a recording of the psychiatric interview or having his counsel present. He claims that the judge's refusal to grant such a protective order denies him not only his privilege against compelled self-incrimination, but also his Sixth Amendment right to counsel.

We have affirmed a judge's discretion to allow a defendant intending to interpose an insanity or lack of criminal responsibility defense to videotape a court-ordered psychiatric evaluation. *Commonwealth* v. *Delaney,* 404 Mass. 1004, 1005 (1989). We have also upheld a judge's discretion to deny a request that counsel be present at a court-ordered psychiatric evaluation. *Commonwealth* v. *Trapp,* 423 Mass. 356, 359, cert. denied, 117 S. Ct. 618 (1996). In *Trapp,* we concluded that the decision to undergo psychiatric evaluation is a critical stage of the criminal process, entitling a defendant to assistance of counsel, but that the psychiatric interview itself is not a critical stage. Thus, absent a claim that the judge abused his discretion in the circumstances of this case, a claim not made by Baldwin, Baldwin's Sixth Amendment claim of denial of assistance of counsel fails. We also commented in *Trapp* that "[t]he alternative of videotaping such interviews was not raised at trial. While we agree with the *Byers* plurality that videotaping might be a sound idea, this issue is not before us." *Id.,* citing *United States* v. *Byers,* 740 F.2d 1104 (D.C. Cir. 1984) (en banc) (plurality opinion) (denying appeal of request for tape recording or counsel presence at court-ordered psychiatric examination based on Fifth and Sixth

Amendment protections). Baldwin's appeal now raises that is-
sue.[4]

In our cases concerning the recording of custodial interroga-
tions at police stations, we have declined to say that the Mas-
sachusetts Declaration of Rights or the United States Constitu-
tion requires electronic recording of such interrogations, nor
were we inclined to create such a common law rule. See *Com-
monwealth* v. *Diaz*, 422 Mass. 269, 273 (1996); *Commonwealth*
v. *Fryar*, 414 Mass. 732, 742 n.8 (1993), *S.C.*, 425 Mass. 237
(1997). We recognized the merits of recording such interroga-
tions, *Diaz, supra* at 272-273, and that electronic recordings
would be a "helpful tool in evaluating the voluntariness of
confessions." *Fryar, supra.* Our language in those cases echoes
our language in *Trapp, supra* at 359, that videotaping "might
be a sound idea." Our acknowledgment, however, of the
advantages in many circumstances to recording either interroga-
tions by police or interviews by psychiatrists does not lead us to
announce a categorical rule on electronic recording in either
context.

The court in *Byers* observed that while a "good idea," the
recording of psychiatric interviews had not been embodied in
the Constitution in general or the Sixth Amendment in particular,
which provide the minima of criminal process under the Federal
Constitution. *Byers, supra* at 1121. A crucial piece of evidence
in that case was a statement by the defendant in the psychiatric
interview that only after commission of the crime had his wife
suggested to him and had he adopted as his own belief that he
could have been under the influence of "magic, spells or some
influence of roots." *Id.* at 1108. That statement was "very
devastating" to the defendant's defense that he was insane at
the time of the crime. *Id.* The court nonetheless observed that
the defendant had the opportunity, in cross-examining the
prosecution's psychiatric expert, to contest the accuracy of both
details of and conclusion from the interview, to point out the
absence in the psychiatrist's written report of the critical state-
ment attributed to the defendant, to introduce other witnesses to

---

[4]We recognize that videotaping may both be more intrusive and produce a
more complete record of a psychiatric interview as compared to audiotaping,
considerations that should be taken into account by a judge in the exercise of
discretionary judgment. Given our holding, *infra*, that a defendant has no
constitutional right to the less intrusive audiotaping, our conclusion also ap-
plies to potentially more intrusive video recording. See *Commonwealth* v.
*Stockwell, ante* 17 (1997).

show that the statement attributed to him was not true, and to introduce contrary conclusions of other psychiatrists. *Id.* at 1121.

In the case before us, unlike the *Byers* case, neither side disputes what Baldwin said in the psychiatric examination. While Baldwin does claim that the Commonwealth's expert was biased, he does not claim that the expert fabricated any evidence. Nor does Baldwin argue to us that statements in the interview disclosed at trial by the Commonwealth's expert were critical pieces of evidence, unavailable from any other source, which inculpate him in the commission of the crime or that prove the Commonwealth's case that Baldwin had the requisite mens rea or mental capacity for his alleged acts.[5] Baldwin claims rather that the bias of the Commonwealth's psychiatrist led him to misinterpret Baldwin's statements and that the expert's characterization of Baldwin's statements could not be tested for reliability because no tape recording was permitted. The answer to that is vigorous cross-examination of the Commonwealth's expert and rebuttal with other expert witness testimony, not a new rule that examination by the Commonwealth's psychiatrist must be recorded in all circumstances.

Baldwin's defense counsel did attempt to cross-examine the Commonwealth's psychiatric expert regarding the expert's own opposition to a tape recording or defense counsel's attendance at the expert's interview of Baldwin. The Commonwealth objected to this line of questioning, and the judge sustained the

---

[5]In our review of the record, we have identified only one statement by Baldwin to the Commonwealth's psychiatrist, not otherwise available to the prosecution, which arguably adds to the Commonwealth's case concerning Baldwin's appreciation of the wrongfulness of his conduct. Baldwin disclosed during the interview that, after he fetched the metal bat from his car and returned to Hall's house, he kept it hidden from the victim's sight behind his back and behind a kitchen counter. That information, together with other information, formed the basis of the psychiatrist's conclusion as to Baldwin's appreciation of the wrongfulness of his action. However, Hall's testimony corroborated Baldwin's attempt to conceal the bat when Baldwin stood in the doorway to the upstairs room where the killing occurred. Whether the evidence concerning concealment of the bat was used to help establish appreciation of wrongfulness, premeditation, or specific intent, Baldwin's statement unique to the psychiatric examination is cumulative of other evidence and does not appear critical to the psychiatrist's opinion, nor to the jury's verdict. There is no claim that this isolated disclosure was "very devastating" or that it would "take the wind out of the defendant's sails and perhaps . . . torpedo him out of the water." *United States* v. *Byers*, 740 F.2d 1104, 1108 (D.C. Cir. 1984) (en banc) (plurality opinion).

objection, foreclosing any discussion at all on that issue, because, the judge stated, this court already had determined that the examination would be made without the presence of defense counsel or a tape recorder. In fact, the order of the single justice reflects that he had declined to interfere with the trial judge's discretion in denying the requested protective order and therefore denied relief under G. L. c. 211, § 3. The single justice had neither ordered, approved, or disapproved of conditioning Baldwin's examination on its being tape recorded or attended by defense counsel. Defense counsel's purpose for this line of questioning was not to engage the expert in the legal issue that is the subject of this appeal, but rather to elicit evidence of the expert's own reluctance to be monitored and thereby to cast doubt on the expert's credibility. The judge's ruling foreclosing that inquiry by the defendant was error. Even though we have declined to adopt a rule requiring tape recordings of custodial interrogations by police, we have said that counsel is entitled at trial to pursue the failure of police to record a defendant's statements and may argue to a fact finder that the absence of a recording casts doubt on the voluntariness of the defendant's statements in custody. *Diaz, supra* at 273. As in that context, so too here, we think that wide-ranging cross-examination, including inquiry as to why an accurate record was not made of a psychiatric interview, is the appropriate antidote to potential overreaching, bias, or mischaracterization of evidence by an agent of the State. In light, however, of the vigorous cross-examination that defense counsel did conduct of the Commonwealth's expert, together with the extensive testimony of the defendant's own experts, we conclude the judge's ruling was not reversible error. We are confident in light of the entire record that the error did not influence the jury. See *Commonwealth* v. *Federico*, 425 Mass. 844, 852 (1997); *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994).

We hold that it is within the judge's discretion to require an electronic recording of the *Blaisdell* interview or to permit counsel to be present at the interview. Even if the examination of a defendant by a psychiatrist retained by the Commonwealth is not recorded, the judge may nevertheless exclude all or a portion of the expert's testimony if it is found to be unreliable.

4. We have reviewed the entire record pursuant to G. L. c. 278, § 33E, and find no additional reason to exercise our

power either to reduce the murder verdict or order a new trial. Accordingly, we affirm Baldwin's conviction.

*So ordered*