COMMONWEALTH *vs.* WAYNE LO.

Berkshire. May 4, 1998. - July 22, 1998.

Present (Sitting at Pittsfield): WILKINS, C.J., ABRAMS, GREANEY, FRIED, MARSHALL, & IRELAND, JJ.

*Practice, Criminal,* Psychiatric examination, Recording of proceedings, Assistance of counsel, Voir dire, Instructions to jury, New trial, Capital case. *Evidence,* Absence of witness, Failure to produce witness, Cumulative evidence, Bias, Credibility of witness. *Mental Impairment. Insanity. Witness,* Bias, Credibility, Psychiatric examination.

At a murder trial, the trial judge did not abuse his discretion in denying the defendant's motion to videotape his court-ordered *Blaisdell* examinations (*Blaisdell* v. *Commonwealth,* 372 Mass. 753, 767 [1977]). [47-48]

At a trial of murder indictments in which the defendant raised the defense of lack of criminal responsibility, the judge's individual voir dire of the prospective jurors on the issue of the insanity defense was sufficient. [48-50]

A defendant charged with murder who raised the defense of lack of criminal responsibility was not entitled to a missing witness instruction when the Commonwealth called to testify only one of its two expert psychiatric witnesses who had examined the defendant, where the testimony of the witness not called would have been adverse to the defendant and was cumulative of the testimony of the other Commonwealth expert. [50-51]

In a murder case, there was no substantial likelihood that the jury would have reached a different verdict had the alleged bias of one of the Commonwealth's expert psychiatric witnesses been admitted at trial, and the trial judge correctly denied the defendant's motion for a new trial. [51-54]

INDICTMENTS found and returned in the Superior Court Department on December 30, 1992.

The cases were tried before *Daniel A. Ford,* J., and a motion for a new trial was considered by him.

*Carlo A. Obligato,* Committee for Public Counsel Services, for the defendant.

*David F. Capeless,* Assistant District Attorney (*Gerard D. Downing,* District Attorney, with him) for the Commonwealth.

ABRAMS, J. A jury rejected the defendant's claim that he lacked criminal responsibility and convicted him of two indictments charging murder in the first degree, as well as other

crimes.[1] The defendant, Wayne Lo, appeals from his convictions and from the denial of his motion for a new trial. The defendant claims that the trial judge erred when he (1) refused to permit the defendant to videotape his *Blaisdell* interview (*Blaisdell* v. *Commonwealth*, 372 Mass. 753 [1977]); (2) refused to conduct a more probing voir dire on the issue of prospective jurors' prejudices against the insanity defense[2]; and (3) denied the defendant's request for a missing witness instruction. The defendant also seeks relief pursuant to G. L. c. 278, § 33E, on his convictions of murder in the first degree. The defendant also asserts that the judge abused his discretion in determining that a new trial was not warranted. We affirm the convictions and the denial of the defendant's motion for a new trial. We decline to exercise our power under G. L. c. 278, § 33E, in favor of the defendant.

1. *Facts.* We set forth the facts in the light most favorable to the Commonwealth, reserving certain details for discussion in conjunction with specific issues raised. See *Commonwealth* v. *Nichypor*, 419 Mass. 209, 210 (1994); *Commonwealth* v. *Salemme*, 395 Mass. 594, 595 (1985).

On the evening of December 14, 1992, the defendant used a high-powered rifle to shoot and kill two people and wound four others on the campus of Simon's Rock College in Great Barrington.

On the morning of the shootings, a package for the defendant containing a gun stock, five thirty-round ammunition clips, and 200 rounds of ammunition arrived at the college. The defendant had ordered the equipment by telephone from a company in North Carolina three days earlier. A college staff member, concerned by the return address label that identified the package's sender as a gun dealer, brought the package to the dean of students. When questioned about the package's contents by the dean, the defendant showed the dean only the gun stock,

---

[1] The defendant also was convicted of six indictments charging armed assault with intent to murder in violation of G. L. c. 265, § 18 (*b*); four indictments charging assault and battery by means of a dangerous weapon; four indictments charging assault by means of a dangerous weapon; and one indictment charging unlawfully carrying a firearm on college grounds, in violation of G. L. c. 269, § 10 (*j*). The defendant does not press any separate errors as to these convictions.

[2] The defendant uses the term "insanity defense" as a shorthand for his claim that he lacked criminal responsibility. We shall use the defendant's colloquialism for convenience.

an empty ammunition can, and the clips. The defendant told the dean that the package contained Christmas presents for himself and his father, to be used at home in Montana. The defendant assured the dean that he had no weapon on campus. During the meeting with the dean, the defendant appeared "calm" and his conversation was "straightforward."

On the afternoon of the shootings, the defendant took a taxicab to Pittsfield. The defendant carried a guitar case with him and told the taxi driver that he was going to purchase tennis racquets for his father for Christmas. At a sporting goods store in Pittsfield, the defendant purchased a semi-automatic assault rifle. The defendant had previously called the store to inquire whether he could purchase the rifle. The defendant returned to the campus and took a final examination.

After the examination, the defendant told a friend that he had purchased a gun and showed the friend the gun and some of the equipment for it. The night before, the defendant had told the same friend that he "was planning to get a gun and bring it to campus and shoot people." Several nights earlier, the defendant had told the friend that he was copying the Book of Revelations rather than studying for examinations "so people would think [I] was crazy when [I] shot people."

While in jail after his arrest, the defendant talked about the killings with other inmates and told them that he was excited that he was getting attention from the news media, and that he hoped to be on television or have a movie made about what happened. The defendant also discussed the insanity plea and asked the inmates "if there was any way to fool . . . the shrink."

At trial, the defendant admitted the shootings but denied criminal responsibility, claiming that he was mentally ill. Five experts testified for the defendant. Two experts testified for the Commonwealth.

2. Blaisdell *interview*. The defendant assigns error to the judge's denial of his motion requesting that the *Blaisdell* examinations be videotaped. See *Blaisdell* v. *Commonwealth*, *supra* at 767. The judge denied the defendant's motion, concluding that the defendant's constitutional right to assistance of counsel did not include the right to record a court-ordered

psychiatric examination.[3] The judge also determined that, because the defendant's interviews with his own psychiatric experts had not been recorded, recording only the Commonwealth's examination would be "unfair" to the Commonwealth. The judge, exercising his discretion, concluded that the defendant's rights could be adequately protected by a thorough written report prepared by the Commonwealth's examining doctors. The defendant contends that a written report is not a sufficient substitute for videotaping because a written report is necessarily not a verbatim account of the interview and is susceptible to the biases of the reporter. There was no error.

"A defendant has no constitutional right to . . . [videotape] record[]" a *Blaisdell* interview. *Commonwealth* v. *Baldwin*, 426 Mass. 105, 111 n.4 (1997), cert. denied, 119 S. Ct. 61 (1998). "[I]t is within the judge's discretion to require an electronic recording of the *Blaisdell* interview." *Id.* at 113. "[W]e think that wide-ranging cross-examination, including inquiry as to why an accurate record was not made of a psychiatric interview, is the appropriate antidote to potential overreaching, bias, or mischaracterization of evidence by [the Commonwealth's experts]." *Id.* Here, defendant's counsel's cross-examination of the Commonwealth's experts was a "withering attack both on . . . [the] technique and on the reliability of . . . [the] opinions."[4] There was no error and no abuse of discretion.

3. *Voir dire.* Prior to trial the defendant brought a motion regarding jury selection, requesting both an individual voir dire and the use of an additional questionnaire containing specific questions regarding potential jurors' personal experiences with mental health professionals and beliefs about the insanity defense.[5] In support of his motion, the defendant offered a public opinion survey he solicited that purported to show that a majority of potential jurors in this case were suspicious of the insanity defense, and almost one-third said that they would not fol-

---

[3]This case was tried before the release of our opinion in *Commonwealth* v. *Baldwin*, 426 Mass. 105 (1997), cert. denied, 119 S. Ct. 61 (1998).

[4]The trial judge so described defense counsel's cross-examination of one of the Commonwealth's experts. Our review of the record indicates that the cross-examination of the Commonwealth's other psychiatric expert was equally vigorous.

[5]The defendant's proposed questions are set out in the Appendix.

low the judge's instructions regarding the insanity defense.[6] The judge allowed the defendant's motion for an individual voir dire and denied his motion for use of the questionnaire. The defendant claims that the judge erred in not conducting a more probing voir dire of prospective jurors on the issue of their bias toward the insanity defense. We disagree.

This case was tried in 1994. At that time we "[did] not require as a matter of law that questions be directed at discovering bias against the defense of lack of criminal responsibility 'in every case involving testimony by psychiatrists and the defense of insanity.'. . . Nevertheless[, we required that] if the defendant show[ed] that there [was] a 'substantial risk that the jury would be influenced by extraneous issues,' . . . the judge should ask questions aimed at discovering those factors" (citations omitted). *Commonwealth* v. *Prendergast*, 385 Mass. 625, 628-629 (1982). "The judge has broad discretion as to the questions to be asked, and need not put the specific questions proposed by the defendant." *Id.* at 628, quoting *Commonwealth* v. *Sanders*, 383 Mass. 637, 641 (1981).

Here, the judge inquired specifically and individually of prospective jurors on the issue of the insanity defense. He asked each prospective juror, "One of the issues in this case may be the defendant's mental state at the time the crimes were allegedly committed. In that regard, there may be testimony from psychiatrists and psychologists and other mental health professionals. Do you have any feelings or opinions that would prevent you from considering such testimony in a fair and impartial manner? . . . Do you have any feelings or opinions that would prevent you from returning a verdict of not guilty by reason of insanity if you felt such a verdict was warranted by the evidence? . . . Is there any other reason you know of why you could not serve as a fair, objective and impartial juror in this case?" There is no merit to the defendant's claim that the judge must ask open-ended questions such as those suggested

---

[6]The judge refused to make specific findings regarding the survey. He ruled that *Commonwealth* v. *Trainor*, 374 Mass. 796, 801-802 (1978), was irrelevant to this case and the requested findings unnecessary because he had agreed to conduct an individual voir dire of prospective jurors.

by the defendant. See *Commonwealth* v. *Bianco,* 388 Mass. 358, 368 (1983). There was no error.[7]

4. *Missing witness instruction.*[8] Doctors Wesley Profit and Peter Cohen together evaluated the defendant for the Commonwealth.[9] Both signed the written report of their evaluation concluding that the defendant was not mentally ill. The Commonwealth, however, called only Dr. Profit as a witness. At the charge conference, the defendant requested a "missing witness" instruction, arguing that the Commonwealth failed to call Dr. Cohen although he was available, because his opinion of the defendant's mental state was more equivocal than Dr. Profit's. The defendant's counsel also told the judge that the defendant could not call Dr. Cohen himself because his testimony would still be harmful to the defendant. The judge denied the defendant's request and, on appeal, the defendant claims error. There was no error.

"Whether an inference can be drawn from the failure to call witnesses necessarily depends . . . upon the posture of the particular case and the state of the evidence. . . . Because the

---

[7]This case was tried before we decided *Commonwealth* v. *Seguin,* 421 Mass. 243 (1995), cert. denied, 516 U.S. 1180 (1996). In *Seguin,* we announced the prospective rule that in cases where the defendant may place his or her lack of criminal responsibility in issue and so requests, "the judge shall inquire individually of each potential juror, in some manner, whether the juror has any opinion that would prevent him or her from returning a verdict of not guilty by reason of insanity, if the Commonwealth fails in its burden to prove the defendant criminally responsible. It will be in the judge's discretion whether to ask more detailed questions concerning a juror's views of the defense of insanity." *Id.* at 249. Although we have applied the law as it stood at the time of the defendant's trial, the judge's voir dire also was consistent with *Seguin*'s requirements.

[8]"Where a party has knowledge of a person who can be located and brought forward, who is friendly to, or at least not hostilely disposed toward, the party, and who can be expected to give testimony of distinct importance to the case, the party would naturally offer that party as a witness. If, then, without explanation, he does not do so, the jury may, if they think reasonable in the circumstances, infer that that person, had he been called, would have given testimony unfavorable to the party." *Commonwealth* v. *Anderson,* 411 Mass. 279, 280 n.1 (1991), quoting *Commonwealth* v. *Schatvet,* 23 Mass. App. Ct. 130, 134 (1986).

[9]Wesley Profit is a clinical psychologist who, at the time of the evaluation and the trial, was the director of forensic services at Bridgewater State Hospital. Peter Cohen is a psychiatrist who, at the time of the evaluation and trial, was a member of the forensic mental health services staff at Bridgewater State Hospital.

inference permitted to be drawn with respect to a missing witness 'can have a seriously adverse effect on the noncalling party — suggesting, as it does, that the party has wilfully attempted to withhold or conceal significant evidence — it should be invited only in clear cases, and with caution.' . . . When it appears that the witness may be as favorable to one party as the other, no inference is warranted. . . . Further, if the circumstances, considered by ordinary logic and experience, suggest a plausible reason for nonproduction of the witness, the jury should not be advised of the inference. . . . In the last analysis, the trial judge has the discretion to refuse to give the instruction, . . . and, conversely, a party who wishes the instruction cannot require it of right." (Citations omitted.) *Commonwealth* v. *Anderson*, 411 Mass. 279, 282-283 (1991).

This is not a case where a party has wilfully attempted to withhold or conceal significant evidence by refusing to call an available witness. Both Dr. Profit and Dr. Cohen signed the report. The Commonwealth was free to use either expert to bring the evaluation in evidence. Nothing in the record shows that Dr. Cohen disavowed the report or disagreed with its material conclusion that the defendant was not mentally ill at the time of the shootings. The Commonwealth plausibly argues that Dr. Cohen's testimony would have been merely cumulative of Dr. Profit's testimony. A party need not offer witnesses if that witness's testimony is cumulative. Any other practice would make trials too lengthy and unwieldy. The defendant concedes that the reason that he did not call Dr. Cohen himself was that his testimony would have been harmful to the defendant. The judge did not abuse his discretion or err in refusing to give a missing witness instruction.

5. *Motion for a new trial.* The defendant moved for a new trial on the ground of newly discovered evidence. The defendant asserted that he had recently discovered that Dr. Profit was homosexual and under investigation for allegedly having a sexual relationship with a young boy. The defendant argued that these facts may have caused Dr. Profit to be biased against the defendant because of the strong antihomosexual feelings expressed by the defendant, or in order to curry favor with the Commonwealth.

As evidence of Dr. Profit's alleged bias the defendant pointed to (1) the fact that Dr. Profit was the director of forensic services at Bridgewater State Hospital and therefore controlled

who conducted the defendant's criminal responsibility evaluation; (2) expert opinion that it was unethical for Dr. Profit to conduct an evaluation of the defendant whom he knew to harbor strong antihomosexual feelings (or at least that Dr. Profit should have revealed his sexual orientation and the ongoing investigation into his conduct); (3) several errors[10] made by Dr. Profit; (4) the fact that Dr. Cohen's more equivocal view of the defendant's criminal responsibility was omitted from the evaluation report signed by Dr. Profit and Dr. Cohen[11]; and (5) the fact that Dr. Profit's opinion concerning the defendant's mental condition differed from the opinions of the defense's experts.

The judge denied the defendant's motion without a hearing. The judge determined that the new evidence only went to the impeachment of Dr. Profit. He determined that it was unlikely that the defendant would have chosen to impeach Dr. Profit with his homosexuality and the investigation. In concluding that the defendant was unlikely to have used the new evidence to impeach Dr. Profit, the judge stated, "Dr. Profit is African American (a fact which was obviously known to the jury by virtue of his appearance before them), and the defendant was alleged to have made a number of racist statements, in addition to his homophobic statements. Accordingly, it was open to defense counsel at trial to argue that Dr. Profit harbored a bias against the defendant because of the defendant's alleged bigotry against members of his (Dr. Profit's) race. The fact that she declined to do so indicates to me that she did not feel such a tactic would be effective, and I seriously doubt whether she would have run the risk of offending the jury by attacking Dr. Profit with evidence of his homosexuality, had she known about it at the time of trial."[12]

The judge also noted that Dr. Profit's testimony was not the only evidence that undermined the defendant's claim of lack of criminal responsibility. There was "well-reasoned" expert

---

[10]The defendant asserted that Dr. Profit omitted a word from the report of another doctor, omitted a sentence from a textbook, and that he ignored salient facts and pertinent information.

[11]In connection with the claim that Dr. Profit omitted portions of Dr. Cohen's opinion, the defendant pointed to an accreditation report that criticized Dr. Profit for attempting to avoid situations in which forensic evaluators might write conflicting opinions.

[12]Defense counsel filed an affidavit saying she would have cross-examined Dr. Profit on his homosexuality. The record indicates that Dr. Profit was keeping his sexual orientation secret from his employer.

testimony from Dr. Michael Annunziata[13] that the defendant was sane at the time of the shootings, as well as evidence from lay witnesses that the defendant made plans before the shooting to feign mental illness. Furthermore, during the defendant's cross-examination of Dr. Profit, the jury were informed of Dr. Cohen's view that the defendant's thinking "took an extremely unusual and religious turn."

The judge also relied on an affidavit from Dr. Cohen executed more than a year after Dr. Cohen left his position at Bridgewater State Hospital. In the affidavit, Dr. Cohen averred that he had no reservation, either at the time of the defendant's evaluation or since, about the propriety of Dr. Profit's participation in the evaluation. Dr. Cohen also stated that he ultimately concluded that the defendant was criminally responsible.

The judge concluded that "[o]n the basis of the evidence that I heard at trial, I am convinced that this newly discovered evidence does not cast any doubt upon the justice of the defendant's convictions, and that it probably would not have been a real factor in the jury's deliberations. Simply put, there is no substantial risk that the jury would have reached a different conclusion had the evidence been admitted at trial." We agree.

"It is well established that '[n]ewly discovered evidence that tends merely to impeach the credibility of a witness will not ordinarily be the basis of a new trial.' " *Commonwealth* v. *Ramirez*, 416 Mass. 41, 47 (1993), quoting *Commonwealth* v. *Toney*, 385 Mass. 575, 581 (1982). "A defendant seeking a new trial on the ground of newly discovered evidence must establish . . . that the evidence . . . casts real doubt on the justice of the conviction. . . . [T]he judge must find there is a substantial risk that the jury would have reached a different conclusion had the evidence been admitted at trial." (Citations omitted.) *Commonwealth* v. *Grace*, 397 Mass. 303, 305-306 (1986). "[T]he judge's disposition of the motion will not be reversed unless it is manifestly unjust, . . . or unless the trial was infected with prejudicial constitutional error" (citation omitted). *Commonwealth* v. *Moore*, 408 Mass. 117, 125 (1990). "In reviewing

---

[13]Michael Annunziata is a board-certified psychiatrist in private practice. He was formerly a senior psychiatrist at the Massachusetts Mental Health Center and a clinical instructor at Harvard Medical School. He has conducted "hundreds" of evaluations for criminal responsibility, including "between fifty and seventy-five" such evaluations in murder cases.

the grant or denial of a motion for a new trial, we will grant special deference to the views of a motion judge who was also the trial judge." *Commonwealth* v. *Haley*, 413 Mass. 770, 773 (1992).

The problem with the defendant's argument is that he assumes that Dr. Profit was the Commonwealth's only witness on criminal responsibility. However, the Commonwealth presented ample other evidence from which the jury could conclude that the defendant was not mentally ill at the time of the shootings. There also was substantial evidence from lay witnesses showing that the defendant planned to feign mental illness in order to avoid criminal responsibility for the shootings.[14] Thus, the record does not support the defendant's assertion that Dr. Profit was the sole underpinning of the Commonwealth's case.

The judge was within his discretion in crediting Dr. Cohen's affidavit. The affidavit was executed more than a year after Dr. Cohen left his position at Bridgewater, thus there is little chance that it was the product of improper pressure on Dr. Cohen. Further, the errors made by Dr. Profit, as well as Dr. Cohen's observation about the defendant's thinking, were brought to the jury's attention by the defendant's cross-examination. We are confident that there is no substantial likelihood that the jury would have reached a different conclusion had the alleged bias of Dr. Profit been admitted at trial.

6. *Review pursuant to G. L. c. 278, § 33E.* The defendant asks that we order a new trial based on his "background and the utter senselessness surrounding his having run amok, which can only be explained as the incredibly unfortunate result of mental illness . . . [and] since the record generates a 'profound doubt' as to the defendant's scienter on December 14, 1992." "The duty imposed on us by the statute does not 'convert this court into a second jury, which must be convinced beyond a reasonable doubt of the guilt of a defendant by reading the

---

[14]There also was evidence from lay witnesses that the defendant planned to obtain a gun long before his rampage. In February, 1994, the defendant told a resident assistant that, when he turned eighteen years of age, he was going to get a gun and kill everyone in the dining hall. In May, 1994, he asked a tutor to let him borrow the tutor's car so he could go to Pittsfield and buy a gun. The tutor refused and expressed concern that a gun could hurt someone. The defendant replied, "Well, that was the idea." Another witness said he was approached twice to see if he would buy the defendant a handgun before the end of the semester and that the defendant said, "I need the gun, I need a gun." The witness described the defendant as "desperate."

reported evidence, without the advantage of seeing and hearing the witnesses.' " *Commonwealth* v. *Lunde,* 390 Mass. 42, 50 (1983), quoting *Commonwealth* v. *Smith,* 357 Mass. 168, 181 (1970). "The issue of criminal responsibility is for the jury, not this court." *Commonwealth* v. *Lunde, supra.* We conclude that justice does not require entry of a lesser degree of guilt or a new trial.

*Judgments affirmed.*

*Order denying motion for a new trial affirmed.*

APPENDIX.

The defendant requested that the judge ask the following questions:

"26. Have you, a member of your family, or a close friend ever consulted with a psychiatrist, psychologist, social worker, or other mental health professional? If so, please describe that experience. Do you think that experience would interfere with your ability to be a fair and impartial juror?

"27. Have you ever known anyone who has suffered from a mental illness or disease?

"Who is that person?

"What is/was the problem?

"Were the people involved satisfied with the results?

"28. What have you read, seen, or heard about the use of psychiatric testimony in criminal trials?

"What do you think about the use of psychiatric testimony in criminal trials?

"Some people think that psychiatry and psychology is all 'smoke and mirrors,' that is, nonsense. What do you think? Do you agree or disagree?

"29. Is there any reason that would make it difficult for you to hear and evaluate the testimony of such expert witnesses fairly and impartially?

"Are you in any way inclined to be skeptical or to distrust such testimony?

"30. Do you have any feelings or beliefs about the so-called insanity defense that would make it difficult for you to return a verdict of not guilty by reason of insanity if such a verdict was warranted by the evidence?

"Have you ever expressed an opinion that you disagree with the law which permits people to be found not guilty by reason of insanity?

"Is there any reason why you would be unable to evaluate evidence related to mental illness fairly and impartially?

"31.  Do you believe that a person who kills or injures another person should be punished even if, as a result of mental illness, he did not appreciate the wrongfulness of his conduct or he could not control his conduct?"