## COMMONWEALTH *vs.* LAURENCE BYNUM HARRIS.[1]

Plymouth. March 12, 2014. - June 18, 2014.

Present: IRELAND, C.J., CORDY, BOTSFORD, GANTS, & LENK, JJ.

*Homicide. Constitutional Law,* Admissions and confessions, Voluntariness of statement, Self-incrimination. *Evidence,* Admissions and confessions, Voluntariness of statement, Expert opinion, Rebuttal, Intent, Competency. *Witness,* Expert, Self-incrimination. *Intent. Mental Impairment. Due Process of Law,* Competency to stand trial. *Practice, Criminal,* Capital case, Motion to suppress, Admissions and confessions, Voluntariness of confession, Required finding, Competency to stand trial, Defendant's competency, Argument by prosecutor.

A Superior Court judge properly denied the criminal defendant's pretrial motion to suppress statements he made to police officers, where the defendant's statements were voluntary, in that the defendant (an adult) went to the police station of his own volition and was not restrained in any way, the defendant's emotional fragility was not necessarily outcome determinative, and the officers were kind to and professional with the defendant and offered him food and water; further, the officers, in employing minimization tactics, did not minimize the seriousness of the potential charge (murder in the first degree) or make false statements to the defendant in order to pressure him into making a confession. [434-437]

There was no basis to the claim that, at a murder trial, the judge erred in denying the defendant's motion for a required finding of not guilty made at the close of the Commonwealth's case, where the basis for the claim was the defendant's mental impairment, about which the jury did not learn until after the Commonwealth had rested its case; likewise, the judge properly denied the defendant's motion for a required finding of not guilty made at the close of all evidence, where there was sufficient evidence for a jury to determine that the defendant had acted with the requisite intent to kill and deliberately premeditated the murder, as well as that the murder had been committed with extreme atrocity or cruelty, and where the jury reasonably could have rejected the defendant's claim of mental impairment. [440-442]

At a murder trial, the admission in evidence (in rebuttal to evidence from an expert witness for the defense, relying in part on statements made by the defendant, that at the time of the killing, because of a mental impairment, the defendant did not have the capacity to form the specific intent to kill or to premeditate) of testimony from the psychiatrist who had examined the

---

[1]As is our custom, we spell the defendant's name as it appears in the indictment.

defendant to determine whether he was competent to stand trial, to the effect that the defendant did not show signs or symptoms of mental illness, did not violate Mass. R. Crim. P. 14; further, in the circumstances of the case, the admission of the rebuttal testimony did not violate the defendant's privilege against self-incrimination. [445-453]

At a criminal trial, a remark made by the prosecutor in closing argument was a fair inference from the evidence. [454]

INDICTMENT found and returned in the Superior Court Department on November 5, 2007.

A pretrial motion to suppress evidence was heard by *Jeffrey A. Locke*, J., and the case was tried before *Barbara A. Dortch-Okara*, J.

*Elizabeth Caddick* for the defendant.

*Gail M. McKenna*, Assistant District Attorney, for the Commonwealth.

IRELAND, C.J. In September, 2011, a jury convicted the defendant, Laurence Bynum Harris, of murder in the first degree on the theories of deliberate premeditation and extreme atrocity or cruelty. Represented by new counsel on appeal, the defendant argues error in (1) the denial of his motion to suppress statements; (2) the denial of his motions for required findings of not guilty; (3) the admission of expert rebuttal testimony; and (4) the prosecutor's closing argument. We affirm the order denying the defendant's motion to suppress and affirm his conviction. We discern no basis to exercise our authority pursuant to G. L. c. 278, § 33E.

1. *Motion to suppress statements.* a. *Background and standard of review.* Prior to trial, the defendant moved to suppress statements he made to police officers and "all fruits thereof," claiming, as relevant here, that his Federal and State constitutional rights were violated because his statements had not been voluntarily made. After conducting an evidentiary hearing, the motion judge[2] denied the motion.

In reviewing a decision on a motion to suppress, "we accept the judge's subsidiary findings of fact absent clear error 'but conduct an independent review of his ultimate findings and conclusions of law.' " *Commonwealth* v. *Scott*, 440 Mass. 642,

[2]The motion judge was not the trial judge.

646 (2004), quoting *Commonwealth* v. *Jimenez*, 438 Mass. 213, 218 (2002). We summarize the judge's findings of fact,[3] supplemented with uncontested testimony adduced at the evidentiary hearing. See *Commonwealth* v. *Isaiah I.*, 448 Mass. 334, 337 (2007), *S.C.*, 450 Mass. 818 (2008), and cases cited.

In the early morning of August 12, 2007, police were alerted to a body found behind a transit terminal on Commercial Street in Brockton. State police Trooper Daniel Harrington was the on-call detective for the district attorney's office and responded to the scene. Brockton police Detective Jacqueline Congdon also responded. The body was identified as the victim. He was found lying in a pool of blood, with apparent head and neck injuries, and was not wearing any pants. Police recovered a pair of sandals and a cellular telephone near his body.

At approximately 6:20 A.M., Trooper Harrington used the cellular telephone to contact "Jari," who was listed on the device's "call history." A man answered saying, "Hello," and then the telephone call was disconnected. A few minutes later, the device rang and Trooper Harrington answered it. He identified himself as a State trooper and said that "something very serious" had happened to the victim and that the police were interested in knowing who the victim had been speaking with recently as indicated on his cellular telephone. The caller, who acknowledged that he was "Jari," agreed to meet Trooper Harrington at the Brockton police station at 6:45 A.M.

Between 6:45 and 7 A.M., the defendant arrived at the Brockton police station and was led by Detective Congdon to an interview room that was approximately ten feet by ten feet in size and equipped with a wall-mounted video camera. The video camera was activated, and the defendant sat alone inside the room briefly until Trooper Harrington and Detective Congdon entered. After introductions were made, Detective Congdon

---

[3]In his written findings, the judge referenced portions of the defendant's interview with police, which was digitally recorded and was admitted in evidence by agreement at the evidentiary hearing on the suppression motion. We note that an appellate court is "in the same position as the [motion] judge in viewing [a recording]." *Commonwealth* v. *Novo*, 442 Mass. 262, 266 (2004), quoting *Commonwealth* v. *Prater*, 420 Mass. 569, 578 n.7 (1995). We have reviewed the recording in its entirety and agree with the judge's characterizations of its content.

asked the defendant whether he had finished high school; learning that he had, she produced a printed set of Miranda warnings and waiver form. Detective Congdon read the defendant the Miranda warnings. When asked whether he understood the warnings, the defendant responded affirmatively and signed the waiver form.

The ensuing interview lasted just under three hours and was recorded in its entirety. The defendant explained that he had met the victim through the Internet about one month earlier, and had a relationship with him. The defendant stated that he had planned to meet the victim at the train station the previous night, but arrived at approximately 10:50 P.M. to discover the victim in an automobile with someone else. The defendant telephoned the victim to inform him that he had arrived, and the two met in front of a bus terminal. The victim left and met a man who was wearing a red hooded sweatshirt (that concealed his features) and blue jeans. The defendant admitted he was somewhat jealous and angry at the victim for having been with another in an automobile earlier and for meeting with the man in the red hooded sweatshirt, and because he thought that the victim was going to end their relationship. The defendant stated that he walked home and went to bed. He stated that he tried, however, to telephone the victim after they had separated.

The officers questioned the defendant about certain details of his story. They informed him that they were in the process of obtaining video surveillance tapes of the transit terminal area. The defendant assured them that the tapes would not show anything different from what he had told them. Asked about his life, the defendant stated that he lived in Brockton with his younger sister, worked at a local grocery market, and was anorexic and had had nothing to eat in two days.[4] The defendant shared that he was depressed on account of a series of failed relationships, a recent argument with his sister, and the way people treated him based on his appearance, including that he wore hair extensions. When asked whether his eating disorder caused him to have blackouts, the defendant replied that he had suffered blackouts in the past, especially in times of stress or

---

[4]The officers provided water to the defendant and offered to get him some food. He once expressed interest in a granola bar, but there was none on site.

exertion. The defendant said that it was possible that he had suffered a blackout the previous night because he could not recall everything that had occurred.

The defendant stated that he had had a dream or premonition that something had happened and that he would never see the victim again. Although denying any conscious memory of what had occurred, the defendant described seeing the victim with another man, and that the other man must be him, although in his mind it was like he was looking at the event as an outside observer. The defendant described a struggle where the victim was struck in the head with a hammer and then stabbed or slashed in the neck with a sculpting tool. The defendant informed the officers that he carried both items in his backpack, but when he looked inside his backpack earlier that morning, his sculpting tool was missing. The defendant admitted that there had been no other man at the transit terminal earlier. When asked about the victim's pants and personal items, the defendant said he had discarded some of the victim's items as he ran home and gave a description of the locations of the trash receptacles. He added that he took the victim's camera as a remembrance and brought it back to his apartment.

Toward the end of the interview, the defendant executed written waiver forms in which he consented to a police search of his home without a search warrant and to the collection of a sample from swabbing his hands. After questioning had ended, and with Trooper Harrington's permission, the defendant used his cellular telephone to contact his sister. During the call, the defendant stated, "I'm at the police station. I killed my boy friend . . . because he was leaving . . . I didn't even plan on doing it, it just happened . . . I hit him . . . [and stabbed him] right in the jugular." The defendant was placed under arrest at the end of the interview.

The defendant was twenty-one years of age at the time of the interview. He had no prior arrest history or involvement with the police. His mother was engaged in active military service and did not live nearby. The defendant lived with his younger sister in an apartment in Brockton. He worked between twenty and twenty-five hours per week at a local grocery store. The defendant told the officers that he had done well in school and

was enrolled for a brief period in a trade school for hair stylists. He professed fluency in English and Spanish, had a working knowledge of Portuguese, and had taught himself some Japanese and Russian. At the outset of the interview, the defendant demonstrated precision in terms of events and especially times. He readily accessed the "call history" on his cellular telephone to provide exact times when he reached out or spoke to the victim.

Concerning his anorexia, the defendant stated that it was a condition of seven years' duration and that he often went days without eating. The defendant stated he had been depressed lately, but had never sought treatment for his depression. He denied any use of illicit drugs or alcohol.

The motion judge took note of the "tone" of the interview. The officers, both in plainclothes, sat at a table with the defendant for most of the questioning (on occasion, one or the other, or in two instances both, left the room). During the interview, there was no police intimidation, shouting, or badgering. The motion judge noted that the officers were almost gentle with the defendant and repeatedly assured him that they understood the pressures he felt as a result of his lifestyle and personal circumstances. At no time during the interview did the detectives engage in any coercive tactics, nor did they threaten or falsely promise anything to the defendant. At times throughout the interview, the defendant became emotional and cried.

b. *Discussion.* The defendant challenges the motion judge's determination of voluntariness. He argues that his statements to police were not voluntary because he was emotionally unstable, suffered from poor physical and mental health, and lacked experience in the criminal justice system at the time he made the statements. He also contends that his statements were not voluntary on account of improper minimization tactics employed by the interrogating officers.

"It is, of course, fundamental that a confession, or . . . an admission, whether made to police or to a civilian, is admissible only if it is voluntarily made." *Commonwealth* v. *Sheriff*, 425 Mass. 186, 192 (1997). "A statement is voluntary if it is the product of a 'rational intellect' and a 'free will,' and not induced by physical or psychological coercion." *Commonwealth* v. *Le-*

*Blanc*, 433 Mass. 549, 554 (2001). Courts must review "the totality of the circumstances," including factors such as "promises or other inducements, conduct of the defendant, the defendant's age, education, intelligence and emotional stability, experience with and in the criminal justice system, physical and mental condition, the initiator of the discussion of a deal or leniency (whether the defendant or the police), and the details of the interrogation, including the recitation of the Miranda warnings." *Commonwealth* v. *Mandile*, 397 Mass. 410, 413 (1986), quoting *Commonwealth* v. *Benoit*, 389 Mass. 411, 419 (1983). "The presence of one or more factors suggesting a statement may have been made involuntarily is not always sufficient to render the statements involuntary." *Commonwealth* v. *Selby*, 420 Mass. 656, 664 (1995). "The Commonwealth bears the burden of proving, beyond a reasonable doubt, that the defendant's statements were made voluntarily." *Commonwealth* v. *Durand*, 457 Mass. 574, 596 (2010), citing *Commonwealth* v. *Jackson*, 432 Mass. 82, 85 (2000).

Based on our review of the defendant's interview with police,[5] we agree with the judge that the Commonwealth met its burden of proving, beyond a reasonable doubt, that the defendant's statements were voluntary. Here, the defendant, although young in age, was an adult when questioned, cf. *Commonwealth* v. *Ray*, 467 Mass. 115, 133 (2014), went to the police station on his own volition, and was not restrained in any way while he was there. *Commonwealth* v. *Cruz*, 373 Mass. 676, 689 (1977). The Miranda warnings were administered at the beginning of the interview, and the defendant had no trouble understanding the instructions and questions of the officers. The defendant appeared sober, alert, oriented, and lucid.

The judge properly acknowledged that the defendant had no prior involvement with police and suffered from poor physical and mental health because of his anorexia, gender identity issues, difficulties resulting from his sexual orientation, and depression. The judge also fully took into account the defend-

---

[5]The defendant does not challenge on appeal the judge's conclusion that the defendant's statements were preceded by a valid waiver of the Miranda rights, which was done "at the outset of the interview," thereby rendering insignificant the precise moment in time when the interview became a custodial interrogation.

ant's "emotional fragility." These factors are not necessarily outcome determinative. The weight of these factors, balanced against other factors considered by the judge, such as the fact that the defendant was able to work and was educated and intelligent, was for the judge to decide. See *Commonwealth* v. *Walker,* 466 Mass. 268, 274 (2013).

We note that other evidence in the record supported the judge's ultimate conclusion. Although the defendant cried at times during the interview, he was able to regain his composure and spoke calmly with police. "The fact that a defendant may have been in a disturbed emotional state, or even suicidal, does not automatically make statements involuntary." See *Commonwealth* v. *LeBlanc,* 433 Mass. at 555. Further, the officers were kind to and professional with the defendant. They did not raise their voices, and they provided him with water and offered him food. See *Commonwealth* v. *Walker,* 466 Mass. at 275. Simply put, the factors raised by the defendant were considered and weighed by the judge and did not compel a conclusion that the defendant's will was overborne to the extent that his statements were not the result of his free and voluntary act.

We turn to the defendant's contention that the minimization tactics used by the interrogating officers rendered his statements involuntary. We have stated that the standard interrogation tactic of minimization is problematic. *Commonwealth* v. *Baye,* 462 Mass. 246, 257-258 & n.12 (2012). "[C]ommon sense tells us that a person being asked by an interrogator to confess to a crime that is repeatedly described as understandable, justifiable, and not particularly serious would likely assume that giving the requested confession will result in lenient treatment." *Commonwealth* v. *DiGiambattista,* 442 Mass. 423, 438 (2004). Use of the tactic by itself, however, does not "compel[] the conclusion that a confession is involuntary." *Id.* at 439. Here, the officers used minimization tactics during their interrogation of the defendant.[6] They did not, however, minimize the seriousness of the potential charge, murder in the first degree. Nor did they

---

[6]The officers, for example, repeatedly assured the defendant that they understood the pressures he felt as a result of his lifestyle and circumstances. They used sympathetic language, such as "you are under a lot of stress" and "you have a tough life." They repeatedly told him, "You have a lot going on,

make false statements to the defendant in order to pressure him into making a confession. Cf. *id.* at 425, 439 (Commonwealth failed to meet its burden of proof on issue of voluntariness when police used combination of trickery and minimization tactics). Viewing, as we must, the totality of the circumstances, the minimization tactics employed here did not render the defendant's statements involuntary. See *Commonwealth* v. *O'Brian*, 445 Mass. 720, 725, 727-728, cert. denied, 549 U.S. 898 (2006) (detective's statement that "the shooting could have been an accident," even if minimization of crime, did not render statement involuntary). In sum, the denial of the defendant's motion to suppress was proper.

2. *Trial.* The facts found and evidence developed at the evidentiary hearing on the defendant's motion to suppress essentially were brought out at trial and need not be repeated. This evidence included introduction of the recording of the interview of the defendant at the Brockton police station. In addition, photographs capturing the defendant's image were generated from recordings taken from surveillance cameras at the transit station on the evening of August 11, 2007, and were admitted at trial.

The jury also could have found the following facts. In addition to having a sexual relationship with the defendant, the victim had a relationship with another man who, two weeks prior to the victim's murder, had become his boy friend. On the night of the victim's murder, his boy friend drove him to the transit station at approximately 11 P.M. Before departing, the victim and his boy friend embraced and kissed. The victim left the automobile driven by his boy friend and went over to the defendant, who was waiting. The victim's boy friend drove away and never heard from the victim again.

The victim suffered blunt force injuries to his head at ten sites. Some of the lacerations were curved. In connection with his head injuries, the victim experienced a "slightly depressed skull fracture" to the right side of his head with resulting subarachnoid hemorrhage of his brain. The victim also had various abrasions and superficial injuries, as well as "short instrument

---

everyone understands that." They also stated to him that people get passionate about certain things "all the time" and "snap everyday of their lives."

injuries" to various parts of his body, including his neck, back, chest, upper abdomen, and knee. Injury to his neck occurred over the carotid artery and jugular vein, resulting in extensive blood loss. The victim died as a result of injuries to his head and neck, including injuries of the skull, brain, and major vascular channels.

Police recovered various items of the victim's and the defendant's from two separate trash receptacles. Inside one, police recovered a black backpack in which there were various items, including a pair of shorts, underwear, a blue towel, a plastic water bottle, a sponge, and the back of a cellular telephone. A wallet containing the victim's identification was found in the shorts. At the other trash container and inside a green trash bag, police discovered a sweatshirt, blue jeans, and sneakers that belonged to the defendant. The bag contained other items, including a camera case and a key pass to the victim's place of employment. From the defendant's apartment, police recovered a hammer and a sculpting tool that matched the description he had provided police of the instruments he had used against the victim.

Subsequent forensic testing indicated that reddish-brown stains from the defendant's sweatshirt and jeans that were recovered from one of the trash receptacles tested positive for human blood. Deoxyribonucleic acid (DNA) testing of these stains revealed that the victim's DNA profile matched the DNA profiles of the blood extracted from these items. Also, the victim's DNA profile matched the DNA profiles of samples taken from the blade and handle of the defendant's sculpting tool. The statistical significance of the DNA testing results was presented to the jury. See *Commonwealth* v. *Lanigan*, 419 Mass. 15, 20 (1994) (evidence of DNA "match" is meaningless without evidence indicating significance of match).

The defendant did not testify. He presented evidence that, at the time of the killing, because of a mental impairment, he did not have the capacity to form the specific intent to kill or to premeditate.[7] *Commonwealth* v. *Laurore*, 437 Mass. 65, 70 (2002). See *Commonwealth* v. *Rutkowski*, 459 Mass. 794, 795

---

[7]"[A] defendant's inability to form the requisite intent for an element of the crime, commonly although incorrectly referred to as 'diminished capacity,'

(2011); *Commonwealth* v. *Gould*, 380 Mass. 672, 680 (1980). In support of this defense, he introduced the testimony of his grandmother and a forensic psychologist, Dr. Frank DiCataldo.

The defendant's grandmother testified that, because the defendant's mother was in the military and traveled considerably, she raised the defendant for several years. At some point, the defendant moved to an apartment with his sister, but he maintained daily contact with his grandmother. According to the defendant's grandmother, the defendant had gender identity issues and carried a sculpting tool and hammer in his backpack because he had been "harassed." She identified some of the defendant's artwork in which he depicted himself as both a male and a female.

Following his arrest, the defendant was privately evaluated by Dr. DiCataldo. Based on his review of various reports, records,[8] and information he gathered, as well as the police interview of the defendant and his own interviews with and testing of the defendant,[9] Dr. DiCataldo testified that, at the time of the killing, the defendant suffered from a mental impairment, namely, borderline personality disorder.[10] In Dr. DiCataldo's opinion, this mental impairment caused "a substantial impairment in [the defendant's] behavior and his thought process" on the night of

could reduce the verdict . . . ." *Commonwealth* v. *Diaz*, 431 Mass. 822, 828 n.4 (2000).

[8] These records included the records from Bridgewater State Hospital, where the defendant had been evaluated for his competency to stand trial.

[9] Dr. DiCataldo interviewed the defendant four times before writing his report. See note 10, *infra*. He also interviewed the defendant after writing his report and prior to trial, on August 11, 2011.

[10] During his cross-examination at trial, Dr. DiCataldo acknowledged that, in his written report dated February 16, 2009, he did not provide a diagnosis for the defendant. In his report, Dr. DiCataldo noted that the defendant "report[ed] having no memory of the alleged offense for which he is accused." Consequently, Dr. DiCataldo wrote, "a definitive opinion about his mental state at the time of the alleged offense is not possible, [but] it appears very likely that he was operating under a significant amount of stress and emotional turmoil that produced an impulsive and angry-driven act of violence that was reactive and poorly controlled in nature." Dr. DiCataldo gave his opinion that "[a]t the present time, [the defendant] is not manifesting any significant symptoms of mental illness that would require continued care and treatment in a psychiatric facility." It should be noted that, in his report, Dr. DiCataldo referenced the competency evaluations of the defendant that had taken place at Bridgewater State Hospital.

the killing. He explained that the impairment could have interfered with the defendant's ability to form the requisite intent for murder and with the ability to make a calculated, premeditated decision to act.

Dr. DiCataldo explained that he based his opinion on the defendant's fear, real or imagined, of abandonment; conflicted and stormy interpersonal relationships, characterized by quick infatuation; profound identity disturbance resulting from his gender identity issues; and problems with modulating and controlling anger. Dr. DiCataldo testified that the defendant's mental impairment explained his "overreaction" to the victim's decision to leave him.

To rebut the defendant's expert evidence, the Commonwealth called Dr. Charles F. Carroll, a psychologist who, as a forensic mental health supervisor at Bridgewater State Hospital, had evaluated the defendant to determine his competency to stand trial. Dr. Carroll expressed the opinion that, at the time of his interviews with the defendant in August and September of 2007, he did not have a mental illness or disorder.

3. *Sufficiency of the evidence.* The judge denied the defendant's motions for required findings of not guilty presented at the close of the Commonwealth's case and at the close of all the evidence. The defendant maintains that, due to his mental impairment, there was insufficient evidence that he was able to form the specific intent to kill required for murder committed with deliberate premeditation; to deliberately premeditate; and to form the specific intent required to commit a murder with extreme atrocity or cruelty. He also asserts that there was insufficient evidence that the murder was committed with extreme atrocity or cruelty because the victim could have been rendered unconscious immediately, thus foreclosing proof of any of the so-called *Cunneen* factors, see *Commonwealth* v. *Cunneen*, 389 Mass. 216, 227 (1983). We conclude that there was sufficient evidence to support the jury's verdict, see *Commonwealth* v. *Latimore*, 378 Mass 671, 677 (1979), and that the Commonwealth's position as to proof did not deteriorate after the defense offered its evidence, see *Commonwealth* v. *Basch*, 386 Mass. 620, 622 & n.2 (1982).

The defendant's argument that there was insufficient evidence

of the malice required to support murder committed either by deliberate premeditation or with extreme atrocity or cruelty are based on his claim of mental impairment. The jury did not learn of the defendant's alleged mental impairment until after the Commonwealth had rested, and reasonably could have rejected it. See *Commonwealth* v. *Platt*, 440 Mass. 396, 400-401 (2003), and cases cited (weight and credibility of evidence is solely within province of jury, and in reviewing sufficiency of evidence argument, all credibility determinations are resolved in Commonwealth's favor). Thus, there is no merit to these claims.

There was sufficient evidence for a jury to determine that the defendant acted with the requisite intent to kill and deliberately premeditated the murder. There was evidence that the defendant had a motive to kill, namely, to seek revenge for having been rejected by the victim. Although to police the defendant admittedly questioned whether the victim, before the murder, was going to leave him, the jury reasonably could have inferred that, just minutes before the murder, the defendant formed the requisite intent to kill when he saw the victim and his new boy friend inside an automobile at the transit station kissing and embracing. See *Commonwealth* v. *Whitaker*, 460 Mass. 409, 419 (2011) ("No particular length of time of reflection is required to find deliberate premeditation; a decision to kill may be formed in a few seconds"); *Commonwealth* v. *Gilbert*, 423 Mass. 863, 869-870 (1996) (motive evidence supported conclusion that Commonwealth's evidence was sufficient to establish malice for murder in first degree). Based on the medical examiner's testimony concerning the number and nature of the victim's injuries, the jury reasonably could have concluded that the defendant hit the victim in the head ten times and cut his carotid artery and jugular vein. Also, from the defendant's statements, the jury could have determined that the defendant used two instruments, a hammer and a sculpting tool, to commit the murder. The jury reasonably could have inferred deliberate premeditation from this evidence. *Commonwealth* v. *Whitaker*, *supra* ("Deliberate premeditation may be inferred from the nature and extent of a victim's injuries, the duration of the attack, the number of blows, and the use of various weapons").

We reject the defendant's contention that the Commonwealth

did not meet its burden of proving that the murder was committed with extreme atrocity or cruelty because the victim could have been rendered unconscious immediately. The record does not compel this version of the facts. The defendant told police that he heard the victim scream in pain after striking him and that the victim had attempted to grab his shirt, thus establishing that the victim was not rendered immediately unconscious. Further, the medical examiner testified that the victim had suffered from blunt injury to *ten* sites of his head. Although the medical examiner stated that *any* blow to the head could have rendered the victim immediately unconscious, he did not testify that a blow to the head was the first injury inflicted on the victim. Nor did he say that the possibility suggested by the defendant (that the first blow was to the victim's head and rendered him immediately unconscious) in fact occurred. The victim could have been conscious when some or all of his head injuries were inflicted. Alternatively, the victim could have been rendered unconscious two to three minutes after the defendant had cut his "major vascular channels." The medical examiner gave his opinion that, had the defendant been conscious for any of his injuries, he would have experienced pain. From this evidence, the jury reasonably could have inferred that the victim was conscious when one or more of his injuries were inflicted and that he experienced pain. See *Commonwealth* v. *Noeun Sok*, 439 Mass. 428, 431 (2003) (sufficient evidence of extreme atrocity or cruelty where victim was conscious after stabbing and experienced pain). The motions for required findings of not guilty were correctly denied.

4. *Expert rebuttal evidence.* The defendant argues error in the admission, over the defendant's objection, of Dr. Carroll's rebuttal testimony. He claims that the admission of Dr. Carroll's testimony violated Mass. R. Crim. P. 14 (b) (2) (B), as appearing in 442 Mass. 1518 (2004),[11] and his right not to incriminate himself under the Fifth Amendment to the United States Constitution or the broader protection afforded by art. 12 of the Massachusetts Declaration of Rights. Last, the defendant asks

---

[11]We apply the version of the rule that was in effect when the defendant was indicted in 2007. See *Commonwealth* v. *Durham*, 446 Mass. 212, 213 n.1, cert. denied, 549 U.S. 855 (2006).

us to adopt a rule that "prohibits fruits of a court ordered competency evaluation to be used against a defendant in any stage of his criminal trial."

a. *Background.* As an initial matter, a defendant is competent to stand trial if he or she has "sufficient present ability to consult with his [or her counsel] with a reasonable degree of rational understanding and . . . a rational as well as factual understanding of the proceedings." *Commonwealth* v. *Vailes*, 360 Mass. 522, 524 (1971), quoting *Dusky* v. *United States*, 362 U.S. 402, 402 (1960). "An expert evaluating [a] defendant's competency to stand trial would not need to ask whether he committed the crimes, but would ask of what he was accused, who the important people are in the court room and what their roles are, or what will be the consequences if he is found guilty, all with a view to evaluating his understanding of the proceedings and his ability to participate in his defense." *Vuthy Seng* v. *Commonwealth*, 445 Mass. 536, 546 (2005), *S.C.*, 456 Mass. 490 (2010). Thus, "[e]xaminations . . . , properly limited to the issue of competency to stand trial, would not ordinarily involve the problems of privilege [against self-incrimination]." *Id.*, quoting *Blaisdell* v. *Commonwealth*, 372 Mass. 753, 769 (1977). That said, communications made by a defendant to a competency examiner are statutorily privileged under G. L. c. 233, § 20B (psychotherapist-patient privilege). See *Commonwealth* v. *Lamb*, 365 Mass. 265, 270 (1974), *S.C.*, 372 Mass. 17 (1977).[12] In addition, to the extent a defendant's privilege against self-incrimination is implicated in a competency evaluation, he will be protected by the immunity protections of G. L. c. 233, § 23B.[13] See *Vuthy Seng* v. *Commonwealth*, *supra* at 547. "If a defendant undergoing a competency examination makes a

---

[12]*Commonwealth* v. *Lamb*, 365 Mass. 265, 266 n.1, 270 (1974), *S.C.*, 372 Mass. 17 (1977), states that G. L. c. 233, § 20B, preserves a patient's right to keep privileged any communication made to a court-appointed psychiatrist, in the case of a court-ordered examination, absent a showing that the defendant was informed that the communications would not be privileged. When a patient is warned that his or her communications would not be privileged and nonetheless makes certain communications during the court-ordered examination, G. L. c. 123, § 20B (*b*), allows admission of the patient's communications "only on issues involving the patient's mental or emotional condition but not as a confession or admission of guilt."

[13]General Laws c. 233, § 23B, provides: "In the trial of an indictment or

statement about his or her mental condition at the time of the crime, that would constitute an 'inculpatory statement[] constituting [an] admission[] short of a full acknowledgment of guilt,' impermissible under G. L. c. 233, § 23B, as interpreted in *Blaisdell* v. *Commonwealth, supra* at 763." *Vuthy Seng* v. *Commonwealth, supra* at 548.

At the time of the defendant's arraignment on August 13, 2007, his attorney[14] requested a preliminary competency examination under G. L. c. 123, § 15 (*a*).[15] After conducting that examination, the examiner gave the opinion that the defendant "showed deficits in his competency-related abilities and recommended further evaluation" and, as a result, the defendant was admitted to Bridgewater State Hospital pursuant to G. L. c. 123, § 15 (*b*).[16]

Dr. Carroll conducted the further examination pursuant to G. L. c. 123, § 15 (*b*), which consisted of several interviews with the defendant in August and September of 2007. In addition to determining competency, the examination required Dr. Carroll to decide whether the defendant needed further care and treatment at Bridgewater State Hospital. See G. L. c. 123, § 15 (*c*).[17] Before speaking with the defendant, Dr. Carroll gave him the *Lamb* warnings, see *Commonwealth* v. *Lamb*, 365 Mass.

---

complaint for any crime, no statement made by a defendant therein subjected to psychiatric examination pursuant to [G. L. c. 123, § 15 or 16,] for the purposes of such examination or treatment shall be admissible in evidence against him on any issue other than that of his mental condition, nor shall it be admissible in evidence against him on that issue if such statement constitutes a confession of guilt of the crime charged."

[14]This attorney was not the defendant's trial counsel.

[15]General Laws c. 123, § 15 (*a*), states, in pertinent part: "Whenever a court . . . doubts whether a defendant in a criminal case is competent to stand trial . . . it may at any stage of the proceedings after the return of an indictment or the issuance of a criminal complaint against the defendant, order an examination of such defendant to be conducted by one or more qualified physicians or one or more qualified psychologists. Whenever practicable, examinations shall be conducted at the court house or place of detention where the person is being held. . . ."

[16]General Laws c. 123, § 15 (*b*), provides, in relevant part: "After the examination described in paragraph (*a*), the court may order that the person be hospitalized at a facility or, if such person is a male and appears to require strict security, at the Bridgewater state hospital, for . . . further examination . . . ."

[17]General Laws c. 123, § 15 (*c*), states: "At the conclusion of the examina-

at 270 (psychotherapist conducting court-ordered examination required to give warning to defendant that communications are not privileged); note 12, *supra*, after which the defendant consented to the interviews.[18] In his report, which is dated September 20, 2007, Dr. Carroll concluded that the defendant was competent to stand trial and was not in need of further care and treatment at Bridgewater State Hospital. He also gave the opinion that the defendant did "not show signs or symptoms of mental illness" during his admission to Bridgewater State Hospital.

At trial, during his rebuttal testimony, Dr. Carroll did not reference his report and did not disclose any statements made to him by the defendant. He testified briefly that he had conducted a forensic evaluation of the defendant in August and September of 2007 and, as a result of the interviews with the defendant, in his opinion, the defendant did not present with a mental illness at this time. During cross-examination, defense counsel elicited that the nature of the examination was one to determine competency to stand trial.

b. *Discussion.* On June 18, 2009, the defendant filed a written notice of his intent to present a defense of lack of criminal responsibility pursuant to Mass. R. Crim. P. 14 (b) (2) (A), as appearing in 442 Mass. 1518 (2004),[19] indicating that the defend-

tion or the observation period, the examining physician or psychologist shall forthwith give to the court written signed reports of their [*sic*] findings, including the clinical findings bearing on the issue of competence to stand trial or criminal responsibility. *Such reports shall also contain an opinion, supported by clinical findings, as to whether the defendant is in need of treatment and care offered by the department*" of mental health (emphasis added).

[18]In his report, Dr. Carroll documented the following: "At the beginning of the interview with [the defendant], I informed him I was a licensed psychologist and forensic evaluator at [Bridgewater State Hospital (BSH)]. I informed him I wished to interview him regarding his competency to stand trial and need for further care and treatment at BSH. I informed him I would prepare a written report that would be submitted to the Brockton District Court and that I might be required to provide oral testimony in court regarding these issues. I informed him that his communications to me were not private or confidential because anything he said to me as well as my observations could be included in that report to the Court. I informed him he did not have to meet with me although I had to prepare a report to the Court whether or not he met with me. I informed him that if he consented to meet with me he could selectively decline to answer questions he did not wish to answer."

[19]Rule 14 (b) (2) (A) of the Massachusetts Rules of Criminal Procedure, as

ant's expected expert witness, Dr. DiCataldo, might rely on statements made by the defendant.[20] "By its terms, rule 14 (b) (2) describes the '[s]pecial [p]rocedures' that govern pretrial discovery related to the defense of lack of criminal responsibility."[21] *Commonwealth* v. *Sliech-Brodeur*, 457 Mass. 300, 315 (2010). Although the defendant ultimately abandoned his defense of a lack of criminal responsibility and instead asserted that, at the time of the killing, he did not, on account of a mental impairment, have the capacity to form the specific intent to kill or to premeditate, these special procedures apply equally in such circumstances. *Id.* at 315 n.19. See *Commonwealth* v. *Diaz*, 431 Mass. 822, 829 (2000), quoting *United States* v. *White*, 21 F. Supp. 2d 1197, 1200 (E.D. Cal. 1998) ("We see no reason to draw a distinction between cases involving a claim of mental impairment and those involving a claim of lack of criminal responsibility, as both 'hinge on the workings of a defendant's mind at the time of the offense' ").

In *Commonwealth* v. *Sliech-Brodeur*, 457 Mass. at 317-318, quoting *Commonwealth* v. *Baldwin*, 426 Mass. 105, 109-110 (1997), cert. denied, 525 U.S. 820 (1998), we explained the requirements of rule 14 (b) (2):

> "Under this rule, when a defendant notifies the court that she intends to offer expert opinion testimony based on her own statements about her mental condition at the time of the crime, a judge may order her to submit to a psychiatric examination on the prosecutor's motion or the judge's order. See Mass. R. Crim. P. 14 (b) (2) (A) (iii), (b) (2) (B).

appearing in 442 Mass. 1518 (2004), provides in relevant part: "If a defendant intends to rely upon the defense of lack of criminal responsibility because of mental disease or defect at the time of the alleged crime, the defendant shall . . . notify the prosecutor in writing of such intention."

[20]At this time, a Superior Court judge acted on a prior discovery motion of the Commonwealth, ordering the defendant to provide the Commonwealth with a copy of the competency report of the defendant "minus redaction of inculpatory statements, psychological tests." Subsequently, on December 30, 2009, a Superior Court judge allowed the Commonwealth's motion for a psychiatric examination of the defendant pursuant to Mass. R. Crim. P. 14 (b) (2) (B), as appearing in 442 Mass. 1518 (2004). The Commonwealth did not follow up with such examination.

[21]"Since 1979, rule 14 (b) (2) has served as the codification of the procedures set out in [and required by *Blaisdell* v. *Commonwealth*, 372 Mass. 753 (1977)]." *Commonwealth* v. *Sliech-Brodeur*, 457 Mass. 300, 317 (2010).

The appointed examiner must file a written report containing his or her findings about the defendant's mental condition at the time of the crime. Mass. R. Crim. P. 14 (b) (2) (B) (iii). If the report contains or is based on testimonial statements of the defendant fitting within the scope of the privilege against self-incrimination, the report may not be made available to either party unless the defendant moves to make it available, or '*during trial*' the defendant raises a defense of lack of criminal responsibility and satisfies the judge that she intends either to testify herself or call an expert witness who will testify based on her statements."

We emphasized, "When a defendant serves notice that she will call an expert witness to testify about her mental condition at the time of the crime based on her testimonial statements, the rule *only* authorizes a court-ordered psychiatric examination of the defendant by the Commonwealth's expert, and nothing more" (footnotes omitted). *Id.* at 318.

We reject the defendant's argument that the admission of Dr. Carroll's rebuttal testimony violated rule 14. Rule 14 is procedural in nature, authorizing the court, in certain circumstances, to order a psychiatric examination of the defendant by the Commonwealth's expert. The rule does not expressly or implicitly bar the admission of other potentially relevant evidence pertaining to the issue of a defendant's mental condition, including such evidence contained in a report of a prior competency evaluation, when offered to rebut the defendant's claim of a mental impairment. See *Commonwealth* v. *Brown*, 75 Mass. App. Ct. 361, 365-366 (2009) ("There is nothing in our rules or in *Blaisdell* v. *Commonwealth*, [372 Mass. 753 (1977),] requiring that the Commonwealth use expert testimony derived from an examination performed subsequent to the defendant's notice under rule 14[b][2][A]. . . . [W]here a court-ordered examination for criminal responsibility already has taken place, another examination may well be unnecessary and a poor use of limited resources" [footnotes omitted]).

There was no violation of the defendant's privilege against self-incrimination under either the Federal or State Constitution in admitting Dr. Carroll's rebuttal testimony. To be sure,

"[a] court-ordered psychiatric examination of a criminal defend-
ant implicates the defendant's constitutional right against
compelled self-incrimination guaranteed by the Fifth Amend-
ment and by art. 12." *Commonwealth* v. *Baldwin*, 426 Mass. at
109. "[F]ull cooperation by a defendant with a psychiatrist,
who is an agent of the prosecution, may result in confession of
the acts charged, probative admissions, leads to the discovery of
other inculpatory evidence, information with which to impeach
a defendant, and evidence as to a defendant's mental capacity."
*Id.*, citing *Blaisdell* v. *Commonwealth*, 372 Mass. at 760. "Only
a constitutionally adequate grant of immunity or a valid waiver
of the privilege by the person who possesses it suffices to
overcome invocation of the privilege in a court-ordered exam-
ination." *Commonwealth* v. *Baldwin*, *supra*, citing *Blaisdell* v.
*Commonwealth*, *supra* at 761.

In *Blaisdell* v. *Commonwealth*, 372 Mass. at 764, we stated
that neither G. L. c. 233, § 20B, see note 12, *supra*, nor G. L.
c. 233, § 23B, see note 13, *supra*, affords a defendant the
"equivalent protection" of the privilege against self-
incrimination. We did conclude, however, that when "a defend-
ant voluntarily submits to a psychiatric interrogation as to his
inner thoughts, the alleged crime and other relevant factors
bearing on his mental responsibility and, on the advice of counsel,
voluntarily proffers such evidence to the jury, . . . the offer of
such testimony based in whole or in part on a defendant's
testimonial statements constitutes a waiver of the privilege for
such purposes."[22] *Blaisdell* v. *Commonwealth*, *supra* at 766. It
also "opens to the State the opportunity to rebut such testimonial
evidence." *Id.*, citing *United States* v. *Baird*, 414 F.2d 700 (2d
Cir. 1969), cert. denied, 396 U.S. 1005 (1970).

In this case, the defendant gave notice of his intent to offer
expert testimony regarding his mental impairment, based in part
on his statements, and then offered Dr. DiCataldo's testimony
as evidence thereof at trial. We conclude that, in so doing, the
defendant waived his constitutional privilege against self-
incrimination and opened the door for rebuttal evidence on the

---

[22]A waiver also may occur when a defendant takes the stand and testifies
on his own behalf on the issue of his criminal responsibility or mental
impairment. See *Blaisdell* v. *Commonwealth*, 372 Mass. at 764.

issue of his mental impairment. See *Blaisdell* v. *Commonwealth*, *supra*. While this rebuttal evidence usually takes the form of testimony concerning the results of a court-ordered psychiatric examination pursuant to rule 14 (b) (2) (B), which contains certain procedures to protect the privilege against self-incrimination, see *Commonwealth* v. *Baldwin*, 426 Mass. at 109-110,[23] we have not limited the nature or type of rebuttal evidence permissible and have not prohibited evidence of the kind admitted in this case, namely, the results of a prior court-ordered competency evaluation of the defendant.[24] We decline to do so here.

We note that the United States Supreme Court in *Buchanan* v. *Kentucky*, 483 U.S. 402 (1987), dealt with a similar issue. In that case, *id.* at 409-411 & n.11, the prosecutor and defense counsel made a joint request, after the defendant's arrest and before trial, that the court order the defendant to be examined to determine whether he should be involuntarily hospitalized for psychiatric treatment, which would require a physician to certify that he presented an immediate danger to himself or others as a result of a mental illness. At trial, after the defendant had introduced psychiatric evidence related to his mental-status

[23]The written report of the psychiatric examination is sealed and submitted to the judge and "shall not be made available to the parties unless (a) the judge determines that the report contains no matter, information, or evidence which is based upon statements of the defendant as to his or her mental condition at the time of, or criminal responsibility for, the alleged crime or which is otherwise within the scope of the privilege against self-incrimination; or (b) the defendant files a motion requesting that the report be made available to the parties; or (c) during trial the defendant raises the defense of lack of criminal responsibility and the judge is satisfied that (1) the defendant intends to testify or (2) the defendant intends to offer expert testimony based in whole or in part upon statements of the defendant as to his or her mental condition at the time of, or criminal responsibility for, the alleged crime." Mass. R. Crim. P. 14 (b) (2) (B) (iii).

[24]In *Commonwealth* v. *Harvey*, 397 Mass. 803, 805, 808-809 (1986), we concluded that the prosecutor improperly used in her cross-examination of the defendant "evidence obtained as a result of the court-ordered [competency] examination" of the defendant because the defendant had not yet introduced any evidence on the issue of mental impairment. We determined, however, that no prejudice resulted because the defendant later offered expert testimony on the issue of his mental capacity that was "based in part on the defendant's statements to him," thus amounting to a waiver of the privilege of self-incrimination. *Id.* at 807, 809.

defense, the prosecutor attempted to introduce evidence of the results of this prior evaluation. *Id.* The Supreme Court rejected the defendant's claim of a Fifth Amendment violation in the admission of this evidence. *Id.* at 423-424. The Court reasoned that, where the defendant put forth a "mental status" defense and had introduced psychiatric evidence related to that defense, "with [the defendant] not taking the stand, the Commonwealth could not respond to this defense unless it presented other psychological evidence." *Id.* at 423. Where that other psychological evidence did not describe any statements of the defendant concerning the crimes for which he was charged, the Court concluded that "[t]he introduction of such [evidence] for this limited rebuttal purpose does not constitute a Fifth Amendment violation." *Id.* at 423-424. The Court later reaffirmed this holding. See *Kansas* v. *Cheever*, 134 S. Ct. 596, 600-601, 603 (2013) (reaffirming rule of *Buchanan* and concluding that, where defense expert who has examined defendant testifies that defendant lacked requisite mental state to commit crime, prosecution may offer evidence from court-ordered psychological examination for limited purpose of rebutting defendant's evidence without violating Fifth Amendment). The Court explained that "[a]ny other rule [prohibiting the Commonwealth's expert rebuttal evidence] would undermine the adversarial process, allowing a defendant to provide the jury, through an expert operating as proxy, with a one-sided and potentially inaccurate view of his mental state at the time of the alleged crime." *Id.* at 601. This principle applies equally in the circumstances of this case. See *Commonwealth* v. *Durham*, 446 Mass. 212, 228, cert. denied, 549 U.S. 855 (2006), quoting *State* v. *Angeleri*, 51 N.J. 382, 385, cert. denied, 393 U.S. 951 (1968) ("Nothing in the State or Federal Constitution guarantees a defendant 'a right so to defend as to deny the State a chance to check the truth of his position' "). Indeed, "[p]ermitting only one party to introduce expert testimony on a critical issue would have a 'distorting effect on the fact finder's role.' " *Commonwealth* v. *Ostrander*, 441 Mass. 344, 354, cert. denied, 543 U.S. 867 (2004), quoting *Commonwealth* v. *Wayne W.*, 414 Mass. 218, 231 (1993).[25]

We emphasize that, as in the case of the waiver contemplated

---

[25]Our conclusion applies to the privilege against self-incrimination under

with regard to the admission of expert testimony resulting from a court-ordered examination pursuant to rule 14 (b) (2) (B), the waiver only should be effective where it was the defendant who placed his mental state at issue and offered expert witness testimony at trial on the issue, and where the Commonwealth's expert witness testimony is given in a manner consistent with G. L. c. 123, § 20B (*b*), and G. L. c. 233, § 23B. See *Blaisdell* v. *Commonwealth, supra* at 769. Here, the defendant put his mental state at issue at trial when offering Dr. DiCataldo's testimony, and the Commonwealth complied with these statutes. Dr. Carroll did not testify about any statements made by the defendant, and his opinion involved only the defendant's mental condition at the time of the examination and did not involve any confession or admission of guilt by the defendant. Thus, we conclude that Dr. Carroll's rebuttal testimony was admissible and its admission did not violate the defendant's privilege against self-incrimination.[26]

We add that, by placing his mental state at issue at trial, the defendant similarly waived any statutory privilege afforded by G. L. c. 233, § 20B. See *Commonwealth* v. *Hanright*, 465 Mass.

both the Federal and State Constitutions. While art. 12 of the Massachusetts Declaration of Rights provides the defendant with greater protection than the Fifth Amendment to the United States Constitution, we are not convinced by the defendant's conclusory argument that it is appropriate in this case to apply art. 12 in a manner different from the Fifth Amendment. The defendant bases his brief argument on the notion that art. 12 provides broader protection than the Fifth Amendment and the fact that the "fruits" of any statements he made during a court-ordered competency examination require him to "furnish evidence" against himself. He ignores, significantly, that he was not compelled to submit to the competency examination and was so advised, see note 18, *supra.* See art. 12 ("No subject shall . . . be compelled to accuse, or furnish evidence against himself").

[26]We reject the defendant's argument, raised for the first time on appeal, that the admission of Dr. Carroll's testimony violated his right to counsel under the Federal and State Constitutions. See *Buchanan* v. *Kentucky*, 483 U.S. 402, 424-425 & n.21 (1987) (rejecting argument claiming violation of right to counsel under Sixth Amendment to United States Constitution where defendant had counsel at time of psychiatric evaluation and counsel was on notice that if he put on "mental status" defense, he would have to anticipate use of psychological evidence by prosecutor in rebuttal). The defendant's counsel at the time of the competency examinations was aware of *Blaisdell* v. *Commonwealth*, 372 Mass. at 766, and its progeny. The fact that we have not specified every type of psychiatric rebuttal evidence that may be permissible does not undermine the general principles of the *Blaisdell* decision.

639, 646-647 (2013) (concluding that defendant "waived any *statutory* privilege in his mental health treatment records to the extent that he may be obliged to submit to [a] court-ordered examination pursuant to rule 14 [b] [2] [B]'"); *Commonwealth v. Connors*, 447 Mass. 313, 319 & n.10 (2006) (in proceedings adjudicating defendant as sexually dangerous person, defendant waived constitutional right against self-incrimination and privilege under G. L. c. 233, § 20B, when he spoke to his own expert and attempted to have his own statements admitted at trial). That said, although the defendant was warned that anything he stated in the interviews with Dr. Carroll was not private or confidential, see note 18, *supra*, he was not expressly informed (and was not required to be so expressly informed) that his statements could be used against him in a proceeding other than one to determine competency, and specifically in a proceeding to determine his guilt on the offense charged. We view the absence of such a specific warning to be troubling where, as here, the results of the competency examination are used later at trial. A person suffering from a mental condition, even if found competent to stand trial, may not be able to make the inference that statements that are no longer private or confidential could be used outside a hearing on the issue of competency and in a proceeding to determine guilt. Thus, in cases going forward, a defendant should be specifically informed, when given the *Lamb* warnings, that the results of, and content of the report of, a competency evaluation may be used against him at trial should he decide to place his mental state at issue at trial and offer evidence in support of that issue at trial. A person suffering from a mental condition may not otherwise fully comprehend the significance of the use to which the examination may be put.

One final matter is in order. We recognize that in the usual course when the defendant puts his mental state at issue, a court-ordered psychiatric examination by an expert witness selected by the Commonwealth will follow with all the attending "[s]pecial [p]rocedures" afforded by rule 14 (b) (2) (B). In the interests of a "fair" result, as contemplated by the *Blaisdell* decision and its progeny, we conclude that when the Commonwealth intends to rebut defense counsel's psychiatric expert evidence concerning the mental state of the defendant, after being

so notified of such a defense pursuant to rule 14 (b) (2) (A), with expert psychiatric evidence obtained apart from an examination under rule 14 (b) (2) (B), the Commonwealth must comply insofar as practicable with the requirements of rule 14 (b) (2) (B), treating its other psychiatric evidence as though it had been obtained pursuant to the rule.

In this case, the defendant faults the Commonwealth for not complying with rule 14 (b) (2) (B) (iii), which states that "[t]he examiner [(the Commonwealth's expert)] shall file with the court a written psychiatric report which shall contain his or her findings, including specific statements of the basis thereof, as to the mental condition of the defendant at the time the alleged offense was committed." The defendant argues that, by not formally notifying the defense of Dr. Carroll's expected testimony, the Commonwealth created unfair surprise and deprived the defendant of the ability to know the content and basis of Dr. Carroll's testimony.

The argument is not supported by the record. The defendant, as early as June, 2009, had an unredacted copy of Dr. Carroll's report. That report, as well as the redacted copy, expressly state that the defendant did "not show signs or symptoms of mental illness" during his admission to Bridgewater State Hospital. Further, in the parties' joint pretrial memorandum, the Commonwealth, in addition to giving notice that Dr. Carroll was on its witness list and was a potential expert witness, disclosed that Dr. Carroll "is expected to testify in rebuttal in the event that the defendant introduces testimony from Dr. DiCataldo regarding his mental condition at the time of the killing of [the victim] [about] the results of . . . interviews he conducted with the defendant during a court ordered competency evaluation . . . [in which he] concluded that the defendant did not manifest any significant symptoms of mental illness at the time of this examination." In view of these circumstances, and the fact that Dr. Carroll testified in rebuttal only that, at the time of his interviews with the defendant in August and September of 2007, the defendant did not have a mental illness or disorder, there was no prejudice to the defendant arising from a lack of a report of an evaluation that he would have received had there been an examination pursuant to rule 14.

5. *Prosecutor's closing argument.* The defendant argues that there was no evidence to support the prosecutor's remark, made during his closing argument, that the defendant "scouted" the area before the murder. We agree with the judge that the remark was a fair inference from the evidence. See *Commonwealth* v. *Ruiz*, 442 Mass. 826, 835 (2004) (prosecutor may make argument presented by way of reasonable inferences that could be drawn from evidence). From surveillance photographs admitted in evidence capturing the defendant at the transit station before the murder and the testimony of the victim's boy friend identifying the man in one of the surveillance photographs as the person whom the victim met when they arrived at the transit station, a reasonable inference could be drawn that the defendant was at the transit station before the victim and became familiar with the area when he was there. There was no error.

6. *Relief pursuant to G. L. c. 278, § 33E.* As is our duty, we have examined the record pursuant to G. L. c. 278, § 33E, and discern no basis on which to grant the defendant relief.

> *Order denying motion to suppress affirmed.*
>
> *Judgment affirmed.*