The juvenile was fifteen years old when he was interviewed on multiple occasions by the police, who suspected he had stolen firearms from the family home. The juvenile made inculpatory statements in the course of two interviews -- one at the home of a neighbor who was watching over him, and the other outdoors while police searched for the weapons nearby. He now appeals from the denial of his motion to suppress these statements, arguing that the statements were obtained in violation of his Miranda rights, and that they were otherwise involuntary. We affirm.
1. Background. We summarize the facts found by the motion judge, who held two evidentiary hearings on the matter. See Commonwealth v. Powell, 459 Mass. 572, 574 & n.7 (2011), cert. denied sub nom. Powell v. Massachusetts, 565 U.S. 1262 (2012).
a. February 15, 2016. On February 15, 2016, Pembroke police officers were dispatched to the juvenile's home for a well-being check regarding a family dispute. The juvenile was not present when the officers arrived, but a firearm was found on the ground, and the juvenile's father and stepmother were arrested and removed from the home. In interviews with the police that evening, the father first advised that there were six registered firearms in the home and, when the police could only account for four of them, the father stated that he suspected the juvenile had taken the other two. The father recounted that he had argued with the juvenile earlier in the evening about the missing firearms, which had resulted in the juvenile leaving the home.
Because the juvenile's father and stepmother were taken into custody on that day (February 15, 2016), they needed to arrange for someone to watch the juvenile and his two younger siblings. A neighbor who had known the family for several years volunteered to do so, to which the juvenile's father and stepmother agreed. The juvenile, who had left after the argument with his father, subsequently returned to the family home that evening. He was invited by the neighbor into her residence; the neighbor then informed the police the juvenile was with her.
After being advised of the father's suspicion that the juvenile had taken the missing guns, Pembroke police Officer Christopher Horkan and Sergeant Paul Joudrey went to the neighbor's residence on the evening of February 15 to speak to the juvenile, in what became the first of the two interviews at issue on this appeal. The officers informed the neighbor that they wanted to speak to the juvenile about missing guns, and that the juvenile's father believed he had taken them. The neighbor agreed to be an "interested adult" during the officers' interview with the juvenile. The two officers, the neighbor, and the juvenile sat at the neighbor's dining room table. Both officers informed the juvenile and the neighbor that the juvenile was not under arrest, but Sergeant Joudrey still recited Miranda rights to the juvenile in the neighbor's presence. The neighbor and the juvenile then signed what the judge called an "Acknowledgement Form," which states that the juvenile "acknowledge[s] that [he] had the opportunity for a meaningful consultation with [the neighbor], an interested adult whose relationship to me is that of [the juvenile],"[2] and that the juvenile "still wish[es] to waive [his] Miranda rights and make a statement." After the juvenile and the neighbor signed the form, Sergeant Joudrey asked the neighbor (with the juvenile present) if she needed to speak to the juvenile before the police began their interview; she indicated that she did not.
The officers told the juvenile that his father had said he took the missing guns. The juvenile initially denied involvement with any firearms. However, after Sergeant Joudrey stated he knew the juvenile was "not being truthful," and that the police needed to locate the firearms so that "nobody gets hurt," the juvenile stated he had taken one of the guns and thrown it into a nearby cranberry bog. When asked if the gun was loaded, the juvenile stated, "it was loaded, but there was not a round in the chamber." Sergeant Joudrey asked if the juvenile was willing to point out where he discarded the gun, and the juvenile agreed. During this conversation, Sergeant Joudrey spoke in a "normal" tone.
That evening the juvenile accompanied the officers to the cranberry bog, without the neighbor. The officers asked the juvenile to show them where he put the firearm, and the juvenile led the officers to a "general area." The officers searched but could not locate the gun. Eventually, due to the late hour and weather conditions, the officers decided to suspend the search and resume searching the next morning; the officers drove the juvenile back to the neighbor's residence.
b. February 16, 2016. Police officers returned to the neighbor's home the following day, and the juvenile once again accompanied the police to the bog to continue the search. Neither the juvenile's parents nor the neighbor were present at the bog during the February 16 search. The juvenile was not under arrest.
While the officers were searching the area, Detective James Burns approached the juvenile, who was standing alone, "pulled him off to the side," and initiated another interview. Detective Burns, who was dressed in plain clothes, stated in a "normal" tone that he "didn't care" if the juvenile had previously "lied to the other officers ... that had been out searching for several hours prior," and that the juvenile could tell him "the truth." Detective Burns told the juvenile he could obtain access to the juvenile's cellular telephone to "read any communications there were regarding the stolen guns," and asked the juvenile to tell him "what he really did with them." In response, the juvenile admitted he sold the guns to "a kid named Robert." The juvenile stated that Robert still had one of the guns, and had facilitated a sale of the other gun to a "guy named Fredo." Detective Burns did not repeat the Miranda warnings during this conversation. He testified that after this disclosure, the juvenile "seemed relieved."
The juvenile was subsequently charged with two counts of possession of a firearm without a license, in violation of G. L. c. 269, § 10(h ), and two counts of larceny of a firearm, in violation of G. L. c. 266, § 30(1).
c. Motion to suppress. On May 16, 2016, the juvenile moved to suppress, among other things, the statements at the neighbor's home and at the cranberry bog.[3] The judge held an evidentiary hearing and thereafter denied the motion to suppress; however, she subsequently reopened the hearing to further consider the Miranda issues and the "interested adult rule."
The judge then held a second evidentiary hearing at which Officer Horkan, Sergeant Joudrey, Detective Burns, and the neighbor testified. The judge issued a second memorandum and order, again denying the juvenile's motion to suppress the statements made at the neighbor's residence and bog. The judge found the juvenile was not in custody at the time of the statements at either location. Regarding the interview at the neighbor's home, the judge found that even if the juvenile was subjected to custodial interrogation, the juvenile had made a knowing and voluntary waiver of Miranda rights after an opportunity to consult with an interested adult. The judge further ruled that in any event, the Miranda requirement did not apply to either interview because both fell within the public safety exception, as articulated in New York v. Quarles, 467 U.S. 649 (1984) (Quarles ). Finally, the judge ruled that even though the juvenile's motion did not specifically raise the issue of voluntariness of his statements, the statements on both days were made voluntarily beyond a reasonable doubt. The juvenile's interlocutory appeal followed.
2. Discussion. This court accepts the motion judge's subsidiary findings of fact, absent clear error, but independently reviews the motion judge's ultimate findings and conclusions of law. Commonwealth v. Scott, 440 Mass. 642, 646 (2004).
a. The neighbor's home. As to the statements made at the neighbor's home, the motion to suppress was properly denied. The juvenile argues that he was in custody at the neighbor's home, that no Miranda warnings were given, and that the neighbor did not qualify as an interested adult. The juvenile's argument, however, is flatly contradicted by the judge's finding, after an evidentiary hearing, that Sergeant Joudrey did verbally provide the Miranda warnings. This finding is corroborated by the "Acknowledgement" form, signed by the juvenile and the neighbor, that stated that the juvenile "still wish[es] to waive my Miranda rights and make a statement." The judge's findings were not clearly erroneous. Thus, even if we assume (without deciding), that the juvenile was in custody at the neighbor's home, he received proper Miranda warnings and voluntarily waived them.
We also reject the contention that the juvenile's Miranda waiver was invalid because the neighbor failed to qualify as an interested adult. Our cases require that when "questioning a juvenile who is age fourteen or older, ... 'the police must provide a genuine opportunity for a meaningful consultation with an interested adult prior to obtaining a Miranda waiver.' " Commonwealth v. Quint Q., 84 Mass. App. Ct. 507, 516 (2013), quoting from Commonwealth v. Leon L., 52 Mass. App. Ct. 823, 826 (2001). But there was such a meaningful opportunity here, where the neighbor fulfilled that role. The juvenile's father and stepmother had agreed that the neighbor would look after the children, given their unavailability. The police offered the opportunity for consultation to both the neighbor and the juvenile, before they started questioning. The neighbor was present throughout the interview, and available to be consulted; there was no request for a consultation from the juvenile. There is nothing on these facts that would have us conclude that the neighbor was insufficiently interested. The cases make clear that the interested adult is not required to actually consult with the juvenile, or to give particular advice. See Commonwealth v. Berry, 410 Mass. 31, 35 (1991) ; Commonwealth v. McCra, 427 Mass. 564, 567-568 (1998) ("It is not necessary for ... a juvenile actually to consult with the interested adult, for it is the opportunity to consult that is critical" [quotation omitted] ). Nor is a close family relationship required. See Commonwealth v. Alfonso A., 438 Mass. 372, 383 (2003) ("Our cases have not required that the adult with whom the juvenile has an opportunity to consult literally be a parent of the juvenile.... The adult must, however, be someone with a relationship with the juvenile who is sufficiently interested in the juvenile's welfare to afford the juvenile appropriate protection" [quotation omitted] ).
b. The bog interview. The bog interview presents a different factual scenario. No interested adult was present during the interview at the bog, and Miranda warnings were not recited. Nevertheless, we conclude that the motion was properly denied as to the bog statements as well, because the public safety exception applies to the bog interview, such that Miranda warnings were not required.
In Quarles, 467 U.S. at 655-657, the United States Supreme Court recognized a public safety exception to the requirement that a suspect be advised of his Miranda rights before he is questioned. The Quarles court held that overriding considerations of public safety justified a police "officer's failure to provide Miranda warnings before" questioning a suspect about the location of his missing gun. Id. at 651. In such circumstances, where "the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment [to the United States Constitution's] privilege against self-incrimination," it is not necessary to advise a suspect of his Miranda rights. Id. at 657.
Quarles has been followed in Massachusetts courts, and indeed, has been applied to factual situations very similar to those at issue here. Thus, in Commonwealth v. Dillon D., 448 Mass. 793, 796-797 (2007), the Quarles public safety exception was applied to the questioning of a juvenile suspected of having a gun near a school. The juvenile's statements were not suppressed, even though no Miranda warnings were given and no interested adult was present. Id. at 794, 797. The court concluded that "there was an immediate need to question the juvenile about the presence of a firearm because the obligation of protecting other students and community members outweighed the administration of Miranda warnings to the juvenile in the presence of an interested adult." Id. at 797.
Subsequent opinions of this court have applied the Quarles exception in similar contexts, where a juvenile is suspected of having a gun, and the whereabouts of the gun is not known. See Commonwealth v. Alan A., 47 Mass. App. Ct. 271, 273-275 (1999) (juvenile left home with father's gun); Commonwealth v. Guthrie G., 66 Mass. App. Ct. 414, 416-418 (2006) (juvenile and friend fled after being seen with gun at juvenile's home).
The Quarles exception and the above principles apply to the facts here. By the time Detective Burns approached the juvenile at the bog, he knew that two firearms were missing and unaccounted for, that the juvenile had professed knowledge of where at least one of the firearms was located, and that the juvenile might well have lied about that location, since no gun had yet been found at the bog. Those circumstances presented a manifest public safety risk -- a loaded gun unaccounted for, and a juvenile lying about its whereabouts. The public safety exception articulated in Quarles and Dillon D. applied to the bog interview, and neither Miranda warnings nor an interested adult were required before proceeding.[4]
c. Voluntariness. Finally, the judge also did not err in concluding, based upon the totality of the circumstances, that the juvenile's statements at the neighbor's home and at the cranberry bog were made voluntarily. While determining whether a statement is voluntary is a separate issue from determining the voluntariness of a Miranda waiver, a reviewing court looks at many of the same factors. Commonwealth v. Woodbine, 461 Mass. 720, 729 (2012). Those factors include the details of the interrogation; the defendant's age, education, intelligence, and emotional stability; whether the questioner used trickery; and whether the questioner made promises or used other inducements such as discussing leniency or a deal. See Woodbine, 461 Mass. at 729 ; Commonwealth v. Walker, 466 Mass. 268, 277 (2013).
Here, the facts demonstrate that the juvenile's statements at both the neighbor's house and the bog "were the product of a rational intellect and a free will." Woodbine, 461 Mass. at 729 (quotation omitted). As to the neighbor's house, the juvenile was informed that he was not under arrest, the neighbor was present throughout the questioning and available to be consulted, and the police officers engaged in a normal conversational tone. No promises or inducements were discussed. Indeed, rather than having his free will overborne, the juvenile had the wherewithal to lie to police officers about where he had placed a gun.
As to the bog, Detective Burns again questioned the juvenile in a conversational tone, and was not coercive. No promises or inducements were made. Additionally, Detective Burns did not employ trickery, and his single statement that he knew the juvenile had lied and did not care if the juvenile had lied was not an express or implied promise of leniency. See Commonwealth v. Harris, 468 Mass. 429, 436-437 & n.6 (2014) (finding no promise of leniency and statements voluntary where questioning officers assured defendant "they understood" and used sympathetic language, but did not minimize seriousness of potential criminal charge). After the juvenile stated that he had sold the guns, the juvenile appeared "relieved." The record demonstrates that the juvenile's statements were voluntary, and the product of free will.
Order dated May 11, 2017, affirmed.

It seems there was an error in filling out this form: where the juvenile's name was inserted, the neighbor's relationship should have been stated instead.

Following the juvenile's statements at the bog, Detective Burns had a further conversation with the juvenile at the police station, during which the juvenile provided more details about the sale of the guns. The juvenile moved to suppress these statements as well. The motion to suppress as to the police station statements was allowed, and those statements are not before us on appeal.

The public safety exception might apply to the questioning at the neighbor's home as well. However, it is unnecessary for us to reach that question.